**In re Gene CRESCENZI, Debtor.**

**Bankruptcy No. 84 B 10399 (PBA).**

United States Bankruptcy Court,
S.D. New York.

Sept. 30, 1985.

A. Lawrence Washburn, Jr., New York City, for debtor.

David Helfant, New York City, for Paul I. Krohn, Adm'r, C.T.A., for Estate of Sally Lippner.

Wisehart & Koch, New York City (Irene M. Opsahl, New York City, of counsel), for Jamice Carey.

Jeffrey Sapir, Yonkers, N.Y., Chapter 13 Trustee.

PRUDENCE B. ABRAM, Bankruptcy Judge:

The debtor, Gene Crescenzi, a suspended lawyer,[1] filed a Chapter 13 petition on March 16, 1984. Crescenzi scheduled four unsecured debts totalling $538,782 in the Chapter 13 statement filed with his petition. Of these debts three arose out of his practice of law prior to his suspension. Two of the debts totalling about $10,000 were listed as not disputed and as to the other two totalling over $520,000 Crescenzi admitted owing none of the amount. He thereafter filed amended schedules in which he amended the listing for the two debts previously not admitted to show one debt of $355,000 as, apparently, a priority claim,[2] as well as contingent, unliquidated and disputed, and to list the second debt of $89,784.79 as secured, as well as "disputed as to jurisdiction and merits."

Motions were made on behalf of these two creditors seeking to dismiss the Chapter 13 petition on numerous grounds, including that Crescenzi's debts were in excess of the statutory limit, lack of good

---

1. Crescenzi, a lawyer admitted to practice in New York since 1955, was suspended from practice by the New York State Courts on October 5, 1982 and from the U.S. Court of Appeals for the Second Circuit on February 15, 1983. He has not been disbarred, however, and he is presently seeking to have his suspension lifted.

2. Since the claim clearly fails to fall into any of the statutory priority categories, this designation has been ignored. See Code § 507.

faith in the proposal of the plan, and lack of income sufficiently stable and regular to make plan payments.[3] For the reasons which follow, the court finds that Crescenzi is not an eligible Chapter 13 debtor because of the amount of his debts. Because the petition is being dismissed on this jurisdictional basis, it is unnecessary for the court to reach the other grounds raised by the two creditors.

■ The discussion must necessarily commence with the words of the Bankruptcy Code. Code § 109(e), which governs eligibility for Chapter 13, provides:

"Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $100,000 and noncontingent, liquidated, secured debts of less than $350,000 * * * may be a debtor under Chapter 13 of this title."

Two questions about the dollar limit on Chapter 13 eligibility have been raised in this case.

1) Are the debts to the two objecting creditors liquidated and noncontingent?
2) Is there any statutory or practical limitation on the amount of contingent or unliquidated debt a Chapter 13 debtor may have?

As to the first question, the court concludes, for the reasons discussed *infra*, that all of Crescenzi's unsecured debts are liquidated and noncontingent and aggregate in excess of the $100,000 statutory maximum. Because of the dispute over characterization, the court has determined that it should reach and decide the second question. The court holds that a debtor is not eligible for Chapter 13 if (a) he has unliquidated or contingent debts that, when combined with his other unsecured debts, exceed $100,000, and (b) he intends to affect the unliquidated or contingent debts in

the Chapter 13 plan and to obtain a Chapter 13 discharge from them.

The general reading of Code § 109(e) which has developed in the cases and authorities is that a Chapter 13 debtor can have any amount of contingent or unliquidated debt and not impair his eligibility. See, e.g., *In re Jandel*, 8 B.R. 855, 7 B.C.D. 320, 322 (Bankr.S.D.Ohio 1981); *In re Sylvester*, 19 B.R. 671, 673 (B.A.P. 9th 1982) ("Put differently, the quoted sections evidence Congressional intent to make individuals who owe, at the commencement of the case, unsecured debt in excess of $100,000 ineligible for Chapter 13 even though the debtor disputes all or part of the indebtedness. Only contingent or unliquidated debt is excluded from the computation."); *In re DeBrunner*, 22 B.R. 36 (Bankr.D.Neb. 1982); *In re Troyer*, 24 B.R. 727, 730 (Bankr.N.D.Ohio 1982); *In re Furey*, 31 B.R. 495 (Bankr.E.D.Pa.1983); *In re Correa*, 15 B.R. 195 (Bankr.D.Md.1981); *In re Lambert*, 43 B.R. 913, 12 B.C.D. 762 (Bankr.D.Utah 1984); 2 Collier on Bankruptcy (15th Ed.1985) ¶ 109.05 at 109–24– 109–25; and Drake and Morris, Chapter 13 Practice and Procedure (1984) at § 3.03 and § 3.04. This court finds such a construction anamolous as it renders a debtor eligible for Chapter 13 even though his debt clearly exceeds the maximum fixed by Congress. The use of the term "liquidated" in Code § 109(e) negates the possibility that a Chapter 13 debtor may have "unliquidated" debts; likewise the term "noncontingent" negates the possibility of "contingent" debts. Likewise the lack of any reference to "disputed" makes it plain that a debtor is eligible for Chapter 13 even if he disputes some of his debts. The three terms, contingent, unliquidated and disputed, have long been used as a triad. See, e.g., former Bankruptcy Rule 11–33(b)(2)(A); for-

---

**3.** Crescenzi's Chapter 13 Statement avers that his annual income prior to his suspension was $55,000. However, since his suspension he states he has no income. In his budget he lists his non-filing wife's income at $300 per month and his own at $2,000 per month, his being based on family contributions and miscellaneous. He also lists monthly rental income of

$350 from 2439 Southern Boulevard, Bronx, New York. He states in response to Question 13 of the Statement that he owns this property, which is not his home, jointly with his brothers, Adolph, Armand and Benito, that the property has a present market value of $30,000 and is free of any mortgage lien. He proposed to pay $450 per month under his plan.

mer and present Official Form 6 at A–3; former Official Form 11–F1; present Official Form No. 1 at Exhibit A; and present Bankruptcy Rule 3003(b)(1). This construction puts meaning into the word "only" appearing at the outset of Code § 109(e): Only debtors whose debts fit within the stated parameters can use Chapter 13. Compare Code § 109(c) ("An entity may be a debtor under Chapter 9 of the title if and only if * * * "). Such a construction is compatible with the nature of the Chapter 13 process. Distributions to creditors are to begin immediately after confirmation, which is to occur within a few months after the case is filed. The process does not contemplate or accommodate lengthy and complex litigation, or even estimation procedures, to fix the amount of unliquidated or contingent claims.

Congress expressed substantial concern in establishing the dollar limitations in Chapter 13. Indeed, the final dollar limits were the result of a late compromise between the House and Senate proposals the lowered the amount from that in the House bill and raised it from that in the Senate.

> "The [House] bill places dollar limitations on the amount of debts of the proprietor who may use Chapter 13, in order to prevent sole proprietors with large businesses from abusing creditors by avoiding Chapter 11. The limits create an irrebuttable presumption that Chapter 13 is inappropriate for businesses with more than $100,000 in unsecured debt or more than $500,000 in secured debt." House Report 95–595 at 119, U.S.Code Cong. & Admin.News 1978, 5787, 6080.

See discussion of legislative history in *In re Ballard*, 4 B.R. 271, 6 B.C.D. 446 (Bankr.E.D.Va.1980). There is a total absence from the House and Senate Reports of any reference to the phrase "noncontingent, liquidated" which appears in both of the proposed bills. This court concludes therefore that those words had been included during the drafting process to emphasize that Chapter 13 was limited to individual debtors with a simple debt structure below the specified dollar limits. Put another way Code § 109(e) expresses a Congressional policy that the broad discharge available in Chapter 13, which includes a discharge from claims that would be non-dischargeable in Chapter 7 or 11, should be limited in scope to $100,000 for unsecured debt and $350,000 for secured debt. Therefore, when it appears the debtor is seeking to obtain a Chapter 13 discharge from contingent or unliquidated debts, which when added to his other debts, exceed the stated dollar limits of Code § 109(e), the debtor is ineligible for Chapter 13. It remains for another debtor, another day and another court to determine whether a Chapter 13 plan can be constructed and confirmed in which the debtor's contingent and unliquidated claims ride through unaffected. See Code § 1322, 1327(a) and 1328(a)(1).

This court prefers this approach to the construction of Code § 109(e), with its resultant limitation on access to Chapter 13 to those debtors with contingent and unliquidated unsecured debts exceeding $100,000 who evidently are seeking to obtain the broad Chapter 13 discharge from debts that would be non-dischargeable in a Chapter 7 or 11. Other courts have reached a similar result through use of Code § 1325(a)(3) with its good faith requirement. See, e.g., *In re Troyer*, 24 B.R. 727 (Bankr.N.D.Ohio 1982); and *In re Sotter*, 28 B.R. 201, 10 B.C.D. 369 (Bankr.S.D.N.Y. 369). Any limitation on Chapter 13 eligibility doubtless will preclude its use by some debtors to their apparent detriment. But Congress is free to limit eligibility, providing it does so in conformity with the constitutional requirement that the bankruptcy laws be uniform. *See Hanover Nat. Bank v. Moyses*, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902) ("The laws passed on the subject must * * * be uniform throughout the United States, but that uniformity is geographical and not personal * * * ").

Turning back to the first issue, whether Crescenzi's liquidated, noncontingent debts exceed $100,000, it is useful to detail the nature of the debts. The single scheduled secured creditor is Jamice Carey ("Jamice"), who was scheduled in the amount of $89,785, which amount is asserted to be

disputed as to jurisdiction and merits. Jamice, whose claim is more fully discussed, *infra*, is stated to be secured by the debtor's interest, which has a stated value of $7,500, in residential real property in the Bronx, which is not the debtor's home and is not claimed as exempted.[4] The three scheduled unsecured creditors consist of Chemical Bank, listed as owed $6,782 and not disputed; Salvatore Christina, listed as owed $5,000 and not disputed; and Paul I. Krohn, Administrator cta of the Estate of Sally Lippner ("Krohn"), who is listed as owed "$355,000 or a major part of said amount" and which debt is stated to be contingent, disputed and unliquidated.

The Krohn debt was the precipitating cause for the Chapter 13 filing as Crescenzi's answer to Question 9 of his Chapter 13 statement indicates:

"Order of commitment for coercive civil contempt by Surrogate's Court, Kings County, in Estate of Sally Lippner, File No. 460/80. Parole in habeas corpus proceeding due to terminate on or about March 21, 1984. Only remaining contempt is failure to immediately repay $355,000 received by [debtor] husband as advances for attorney fees for services to estate. Said fees have been applied for and have not been disallowed by the Surrogate."

The Chapter 13 filing invoked the automatic stay of Bankruptcy Code § 362 and the commitment order has not therefore been enforced.

The Krohn claim arose as follows. Crescenzi and Doreen Kay were preliminary co-executors of the estate of Sally Lippner. Mrs. Lippner, who was apparently a longtime friend of Crescenzi, executed her will in December 1979 and died on January 11, 1980. Mrs. Lippner's daughter filed objections to the will. Crescenzi and Kay, as preliminary co-executors, retained a law firm to litigate the trial in the Surrogate's Court on the objections to probate filed by the daughter. During the course of the trial and in November 1981, Crescenzi revealed that he had received payments totalling more than $320,000 as attorney's fees from the estate.[5] Surrogate Bloom *sua sponte* by order dated November 23, 1981, suspended the preliminary letters testamentary issued to Crescenzi and Kay and directed them to forthwith return to the estate all estate funds taken on account of legal compensation or commissions. Crescenzi failed to comply with the November 23, 1981 order.

By a decree signed February 5, 1982, Surrogate Bloom appointed Krohn administrator c.t.a. of the Lippner Estate and directed Crescenzi and Kay to surrender all estate records and assets in their possession or under their control to the administrator c.t.a. and to file their account and a petition for its judicial settlement. Krohn duly qualified and is now acting as administrator c.t.a.

Crescenzi also failed to comply with the February 5, 1982 order. There began a series of proceedings in the Surrogate's Court and elsewhere seeking to have Crescenzi found in contempt for his failure to comply. After Crescenzi's attempts to have the matter heard in the United States District Court for the Eastern District of New York proved unsuccessful, a hearing was held in the Surrogate's Court in May 1982 after which Kay and Crescenzi were

---

4. Jamice urges that the entire amount of the debt due to a creditor whose debt is even partially secured is to be treated as secured for the purposes of Chapter 13 eligibility. Thus, in her view, none of his debt to Jamice would be counted towards the $100,000 unsecured limit. This argument flies in the face of the plain language of Bankruptcy Code § 506(a) which states that a claim is secured only to the extent of the value of the property securing it and unsecured as to the remainder. Code § 109 must be construed in light of this and the argument is rejected. See *In re Prince*, 5 B.R. 432, 6 B.C.D. 783 (Bankr.W.D.N.Y.1980); *In re Ballard*, 4 B.R. 271, 6 B.C.D. 446 (Bankr.E.D.Va.1980); and *In re Day*, 747 F.2d 405 (7th Cir.1984).

5. This amount which was received, apparently, in the twenty-three months between January 1980, when Mrs. Lippner died, and November 1981, amounts to approximately $160,000 per year. This is difficult to reconcile with Crescenzi's pre-suspension stated income of $55,000 per year.

directed to purge themselves of contempt by complying with the November 23, 1981 and February 5, 1982 orders within ten days. Kay purged herself of the contempt but Crescenzi failed to do so.

On September 23, 1982, Surrogate Bloom signed an order of commitment directing the Sheriff of the City of New York to deliver Crescenzi to Surrogate's Court to determine whether his continued commitment would be appropriate. Upon Crescenzi's application to the Appellate Division of the Supreme Court for the Second Judicial Department, an order issued on September 29, 1982, granting Crescenzi a conditional stay of the Surrogate's Court hearing providing that he comply with certain conditions, including turnover of estate assets to Krohn by September 30, 1982 and filing of an account of his proceedings as preliminary co-executor no later than November 1, 1982.

Although Crescenzi complied with several conditions of the order, including the turnover of estate assets to Krohn, he failed to file the required accounting or comply with certain other conditions. As a result, the Appellate Division dismissed his appeal and vacated the stay of the September 29, 1982 order.

Thereafter, on February 10, 1983 the Surrogate again signed an order of commitment to the Sheriff to deliver Crescenzi to determine whether his continued commitment, imposition of a fine or both would be appropriate. An examination of Crescenzi was conducted and the Surrogate determined that Crescenzi's commitment should be continued.

On March 25, 1983 an order was signed directing the Sheriff to deliver Crescenzi to the City jail and keep him in custody until he purged himself of the contempt. Crescenzi was thereafter placed in custody. After his commitment, a habeas corpus proceeding ensued in the Supreme Court, Kings County and Crescenzi was released on parole. Crescenzi was examined with respect to his finances and assets to determine his ability to repay the money he had received from the estate. Crescenzi refused or failed to explain satisfactorily to the court his disposition of approximately $200,000 of estate checks payable to cash. Crescenzi informed the court that he would file an accounting promptly. On March 28, 1983 and prior to filing an accounting, Crescenzi executed an affidavit of confession of judgment confessing indebtedness to Krohn, as administrator c.t.a., in the amount of $320,000, the amount which Crescenzi then admitted to having received from the estate. Crescenzi's accounting and petition for judicial settlement was not filed until February 1984, over ten months later and some twenty-seven months after the filing had been initially directed. The accounting as finally filed reflected that Crescenzi had received $355,937.22 as legal fees from the estate. Thereafter, Justice Pizzato of the Supreme Court, Kings County denied the writ of habeas corpus, having determined that there was sufficient ground for the issuance of an order of commitment. As set forth above, the Chapter 13 petition was filed before the date set for Crescenzi to be committed. It is against this background of extended litigation over more than two years, that Crescenzi urges the court to find that his debt to Krohn is both contingent and unliquidated.

Bankruptcy Code § 101(11) defines "debt" as "liability on a claim". The term "claim" is defined in Bankruptcy Code § 101(4) as:

> "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured * * *"

It is apparent from the string of words used in the definition of claim that the terms "liquidated", "contingent" and "disputed" have distinctive meanings. Simple reflection brings to mind examples that show a claim can be disputed, yet be liquidated and noncontingent. A contingent claim may be both liquidated and undisputed. Likewise, a claim can be disputed, unliquidated and contingent.

■ The generally accepted definition of a contingent claim is that given in *In re All Media Properties*, 5 B.R. 126 (Bankr.S.D. Tex.1980):

"A claim is contingent as to liability if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created. On the other hand, if a legal obligation to pay arose at the time of the original relationship, but that obligation is subject to being avoided by some future event or occurrence, the claim is not contingent as to liability. The obligation to pay existed from the outset; no outside event is necessary to bring the obligation into existence, but rather the obligation may be extinguished by payment. This does not render such a debt contingent as to liability, but renders it only unmatured." 5 B.R. at 133.[6]

See also *Denham v. Shellman Grain Elevator, Inc.*, 444 F.2d 1376, 1380 (5th Cir. 1971) (a claim reduced to judgment is no longer contingent.) It is apparent that the Krohn claim was not contingent on the date the Chapter 13 petition was filed because liability had been fixed by the orders of the Surrogate's Court of November 23, 1981 and February 5, 1982 which were about to be enforced through a jail stay.

Furthermore, Crescenzi's obligation to Krohn was liquidated on the date the petition was filed. It had been liquidated at $320,000 when Crescenzi signed a confession of judgment[7] in that amount in March 1983. The amount was thereafter liquidated at $355,937.22 when Crescenzi filed his long-delayed accounting in February 1984. Indeed, Crescenzi's earlier testimony would appear to have been sufficient to liquidate the debt. The Krohn claim alone substantially exceeds the $100,000 limit on unsecured liquidated and noncontingent debt.

Crescenzi urges that in considering whether the debt limit is exceeded the court must consider his claimed right to an allowance of attorney's fees from the Lippner Estate. It is true that Crescenzi has filed a request for allowance of attorney's fees in the full amount of the monies he admitted paying himself in the accounting. Lengthy hearings are going forward in the Surrogate's Court on whether his accounting and request for fees will be approved.[8] The possibility that he may ultimately be successful in obtaining an award in the future does not serve to diminish the present amount of his matured, liquidated and noncontingent obligation to Krohn at the time when the Chapter 13 petition was filed. Indeed, it would appear that this claimed right of offset to the immediate turnover obligation must have been at least implicitly decided against Crescenzi in the state courts. Crescenzi's claim to an allowance of attorney's fees is in the nature of a counterclaim, rather than in the nature of a defense or affirmative

---

6. Certain cases subsequent to *All Media* did adopt or utilize definitions for "contingent" that included at least some disputed claims. See, e.g., *In re Covey*, 650 F.2d 877 (7th Cir.1981). However, those courts were struggling to find a mechanism to be able to deal with a contested involuntary petition filed by the holder of a substantially disputed claim. On July 10, 1984, Congress adopted the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"), which included an amendment to Code § 303 which precluded holders of claims subject to a bona fide dispute from being petitioning creditors, thus correcting the perceived problem. For these reasons, this court declines to apply these decisions to the Chapter 13 context in which the cases have drawn a clear distinction

between "contingent" and "disputed" and in which the policy considerations are different.

7. While Krohn concedes that the confession of judgment was not to be entered except upon certain terms, not met on the date the Chapter 13 petition was filed, the court nevertheless considers it in light of the facts and circumstances existing at the time it was executed as an admission of the amount of the attorney's fees taken by Crescenzi and liquidating the claim.

8. The court modified the automatic stay to permit the Surrogate's Court litigation to proceed since it was clear that that litigation would be required to be concluded whether or not the Chapter 13 petition was retained or dismissed.

defense. Thus, his potential right to an allowance does not reduce the amount of his debt to Krohn on the date the Chapter 13 petition was filed. Even if this court were prepared to give any weight to the claimed right to an allowance, Crescenzi would have to be entitled to an award of over $300,000, an outcome that seems improbable in light of the litigation history, before Crescenzi's debts would be below the $100,000 maximum.

Crescenzi seems to be urging that his debt to Jamice should be excluded because he has disputed it. The cases cited *supra* make it plain that disputed debts must be included in the $100,000 debt calculation. See, e.g., *In re Sylvester*, 19 B.R. 671, 673 (B.A.P. 9th 1982), quoted *supra*. However, a brief discussion of the debt to Jamice is warranted in order that it be plain that however Crescenzi had chosen to characterize the debt in his Chapter 13 pleadings, the court would still find the debt to Jamice to be liquidated and noncontingent. A rather sordid family episode underlies the debt, which is based on a judgment obtained against Crescenzi. As drawn from the trial court's findings, it appears that Ona Carey ("Ona"),[9] separated from her husband James Carey ("James"), a New York City policeman in 1972 or 1973. James retired from the police force in 1973 and died on or about March 4, 1975. It subsequently appeared that in January 1974, James had designated his daughter, Jamice, who had been born in 1959 and was still an infant at the time of her father's death, as the beneficiary of his pension benefits. Ona arranged to have herself appointed as guardian of the property of Jamice and in that capacity in September 1975 received a check for $72,469.51 from the police pension fund trustees. Certain withdrawals were made by Ona from that fund with the approval of the Surrogate's Court. Ona, prior to Jamice's reaching age 18, retained Crescenzi to represent her. Ona, through Crescenzi, instituted an action against various defendants, including the City of New York, but

excluding her daughter as a party, to obtain a ruling that the designation of Jamice as beneficiary was improper and ineffective and that Ona was in fact and in law the proper beneficiary of James' pension fund. Although Ona did not advise Jamice of the institution of the suit, Jamice was named as a third party defendant by one of the original defendants. At the time the third party summons and complaint was served on Jamice, Ona took the papers from Jamice, not allowing Jamice to read them and advising Jamice that the significance of the papers was that Jamice was going to jail.

Thereafter Ona arranged for Jamice to accompany Ona to Crescenzi's office. At a conference in Crescenzi's office on April 18, 1977, Crescenzi told Jamice that "a grievous error had been made" which Jamice could correct by signing papers making her mother the rightful person to receive the pension monies. Jamice then executed the assignment in Ona's and Crescenzi's presence. The subsequent effect of the assignment was that a decree of the Surrogate's Court dated June 20, 1977 issued which released $60,388.71 to Ona. Of that amount between $20,000 and $25,000 was paid to Crescenzi.

Thereafter, and after turning eighteen, Jamice instituted an action in the Supreme Court of the State of New York, Index No. 16197/78, against Ona and Crescenzi to impose a constructive trust on the monies formerly held for her benefit. After a trial and based on detailed findings of fact and conclusions of law, only summarized above, a final judgment issued in favor of Jamice on or about October 4, 1982. The judgment awarded Jamice $72,469.50, which with interest of 9% compounded annually from September 15, 1975, brought the amount as of September 15, 1982, to $132,-477.08, as well as $47,092.50 in attorneys' fees, costs and disbursements, a total of $179,569.58. The judgment held Ona liable for the full amount and Crescenzi jointly and severally liable for one half of the sum.

---

9.  Ona filed a Chapter 7 petition in mid-1983 and her debt to Jamice was declared nondischarge-able.

Judgment in the amount of $89,784.79 was entered against Crescenzi. Although Jamice recovered approximately $20,000 during the course of Ona's bankruptcy case, the vast bulk of the judgment has not been satisfied by either Ona or Crescenzi. At the time Crescenzi filed his Chapter 13 petition, the judgment of Jamice against him was final, not the subject of any appeal or any stay of enforcement.[10] Thus, it is apparent that Crescenzi's debt to Jamice was both liquidated and noncontingent at the time the Chapter 13 was filed.

Denial of Chapter 13 relief does not foreclose Crescenzi from seeking any relief under either Chapter 7 or 11 of the Bankruptcy Code to which he may be eligible. The discharge available under Chapter 7 or 11 is substantially less broad than that available in Chapter 13 and Crescenzi may be unable to obtain a discharge of one or more of his debts in a Chapter 7 or 11 case. But that is the statutory scheme that Congress constructed in the Bankruptcy Code.

This Chapter 13 case is ordered dismissed with this order to be stayed for 10 days to give Crescenzi the opportunity to convert his case to one under Chapter 7 or 11 or to obtain a stay pending appeal should he be so advised.

It is so ordered.

---

10. A hearing was held approximately one and one half months before the Chapter 13 petition was filed and on February 1, 1984 on a motion by Ona to set aside the judgment and to vacate the findings of fraud, in which motion Crescenzi apparently joined. Crescenzi appeared at the hearing. The court immediately denied the motion to set aside the verdict and then proceeded to consider and deny the balance of Ona's motion, which was predicated on ineffective representation by Crescenzi during the trial because of his alleged mental incapacities and that she had in essence done what her attorney, Crescenzi, had told her to do. The court found that Ona was an active participant in the fraud who had known what she was doing. The court further found that while Crescenzi's behavior was unusual, or perhaps eccentric, he was a very vigorous advocate who dealt with the issues with more perseverance and skills than many lawyers.