In re CHATEAUGAY CORPORATION, Reomar, Inc., The LTV Corporation, et al., Debtors.

UNITED STATES of America, Plaintiff,

v.

CHATEAUGAY CORPORATION, Reomar, Inc., The LTV Corporation, et al., Defendants.

STATE OF NEW YORK, Plaintiff,

v.

LTV STEEL COMPANY, INC., Defendant.

Nos. 87 Civ. 8144 (JES), 88 Civ. 0834 (JES).

United States District Court, S.D. New York.

March 15, 1990.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., (Susan P. Johnston, James L. Garrity, Jr., Richard Schwartz, Asst. U.S. Attys., Roger J. Marzulla, Asst. Atty. Gen., Joel M. Gross, Peter Mounsey, Environmental Enforcement Section, Land and Natural Resources Div. U.S. Dept. of Justice, John Wheeler, Rich Robinson, U.S. E.P.A. Office of Compliance and Enforcement Monitoring, of counsel), Robert Abrams, Atty. Gen. of the State of N.Y. (Norman Spiegel, Nancy Stearns, Asst. Attys. Gen., Environmental Protection Bureau, of counsel), New York City, for plaintiff.

Pepper Hamilton & Scheetz, Philadelphia, Pa. (Michael H. Reed, Francis J. Lawall, James S. Lawlor, of counsel), Hughes Hubbard & Reed, (Sandor E. Schick, New York City, Keith Welks, Chief Counsel, Barbara H. Brandon, Director, Western Region, Office of Chief Counsel, Diana J. Stares, Asst. Counsel Dept. of Environmental Resources, Com. of Pa., Harrisburg, Pa., of counsel), for amicus curiae, Com. of Pa.

Davis Polk & Wardwell, (Lewis B. Kaden, Karen E. Wagner, Joan I. Greco, of counsel), Levin & Weintraub & Crames, (Michael J. Crames, Herbert S. Edelman, Edmund M. Emrich, of counsel), New York City, for defendants.

Stroock & Stroock & Lavan, (Lawrence M. Handelsman, Mark A. Speiser, Madelaine Berg, Robert Raskin, of counsel), New York City, for Committee of Unsecured Creditors of the LTV Corp., et al.

Myerson & Kuhn, (Edgar H. Booth, Peter D. Wolfson, Mary S. Zitwer, Carole Neville, Edward Holtzman, of counsel), New York City, for Equity Sec. Holders Committee of LTV Corp., et al.

## OPINION AND ORDER

SPRIZZO, District Judge.

In these actions, the United States of America and the State of New York ("NYS") seek declaratory judgments as to the dischargeability of environmental claims in the bankruptcy proceeding of defendant LTV Corporation and affiliated corporations (collectively "LTV"). Specifically, the government seeks a judgment declaring that (1) response costs incurred post-confirmation pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* (1984 & Supp. V 1987), are not dischargeable claims under the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (1988);[1] (2) environmental injunctive obligations are not dischargeable claims; and (3) certain environmental obligations are entitled to an administrative priority. NYS seeks a similar declaratory judgment under federal and state law. Defendants have also moved for summary judgment declaring that all of these contentions are legally incorrect.

## BACKGROUND

LTV is a diversified company primarily involved in steel, aerospace/defense, and energy products. *See* Joint Statement of Undisputed Facts ("Undisputed Facts") at ¶ 1. The industries in which LTV's subsidiaries are engaged typically generate substantial amounts of hazardous industrial wastes which need to be treated or disposed of on the premises or at an off-site location. *See id.* at ¶ 3. On July 17, 1986 and thereafter, LTV and sixty-six affiliated corporations filed petitions for reorganiza-

tion under Chapter 11 of the Bankruptcy Code. *See id.* at ¶ 1. Since that time over thirty-four thousand proofs of claims have been filed against the debtors, including those filed by the federal government and NYS which seek recovery of amounts owed by LTV and its affiliates for alleged violations of the environmental protection laws.

These motions involve the relationship between the bankruptcy laws and several federal and state statutes which address the environmental cleanup and regulation of hazardous substances, although the primary reliance is placed on CERCLA.

### CERCLA

■ Congress enacted CERCLA in 1980 "to provide for liability, compensation, cleanup, and emergency response to hazardous substances released into the environment." *United States v. Reilley Tar & Chemical Corp.*, 546 F.Supp. 1100, 1111 (D.Minn.1982); *see In re The Charter Co.*, 862 F.2d 1500, 1503 (11th Cir.1989); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986). In order to ensure that hazardous materials are removed as promptly as possible, Congress established a multi-billion dollar federal Hazardous Substances Response Trust Fund ("Superfund") from which cleanups of hazardous substances could be made promptly, with the costs of that cleanup being subsequently assessed against the responsible parties. Congress provided for an assessment of liability after the cleanup procedures have been completed in order to avoid the delays that would result from the inevitable litigation over liability. *See In re Combustion Equipment Assocs., Inc.*, 838 F.2d 35, 37 (2d Cir.1988); *Wagner Seed Co. v. Daggett*, 800 F.2d 310, 315 (2d Cir.1986). Thus, liability under CERCLA is not assessed until after the Environmental Protection Agency ("EPA")[2] investigates a site, decides the response actions which are necessary, and

---

1. No contention has been made that claims under the environmental laws which are reduced to judgment or relating to response costs incurred before confirmation of a reorganization plan are not dischargeable under the Bankruptcy Code.

2. Although CERCLA delegates authority to the President, the President has transferred most of that authority to the EPA. *See State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1037 n. 2 (2d Cir.1985).

determines which potentially responsible parties ("PRPs") will bear the costs. *See Combustion Equipment, supra,* 838 F.2d at 37.

■ Under 42 U.S.C. § 9604(a), the EPA may effect removal or remedial action where there is a release or threatened release of a hazardous substance,[3] but may permit this action to be taken by the owner or operator of the facility or by a responsible party if it determines that such action will be taken promptly and properly. *See* 42 U.S.C. § 9604(a)(1).[4]

■ Before the EPA undertakes a remedial action, it prepares a Remedial Investigation/Feasibility Study ("RI/FS"), selects a remedy, and issues a Record of Decision ("ROD"). *See Combustion Equipment, supra,* 838 F.2d at 36; 40 C.F.R. § 300.68 (1989). The final agency decision is based on an administrative record developed by the EPA. Once the ROD is issued, the EPA may undertake a remedial action using Superfund money as long as the site is on the National Priority List ("NPL"), although there is no such requirement for a removal action.[5] *See State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1046–47 (2d Cir.1985).

■ The costs of any removal or remedial action undertaken by the federal or state government, other necessary costs, and damages for the injury to or loss of natural resources may then be assessed against (1) the owner or operator of a facility; (2) persons who owned or operated a facility at the time hazardous substances were disposed of; (3) persons who arranged for disposal of hazardous substances; and (4) persons who transported such substances. *See* 42 U.S.C. § 9607(a). Such liability may be imposed if the following elements are met:

(1) Each of the sites where the cleanup occurs is a "facility" as defined by 42 U.S.C. § 9601(9).

(2) A "release" or "a threatened release" of a "hazardous substance" has occurred at the site.

(3) The release or threatened release has caused the United States or another eligible party to incur response costs.[6]

*See Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152–53 (9th Cir.1989); *Shore Realty, supra,* 759 F.2d at 1043; *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 184 (W.D.Mo.1985). The statute imposes strict liability; if the above elements are met, a PRP will be liable without a showing that he actually caused the hazardous condition. *See id.* at 1044.[7]

■ In addition to this remedy, if there is an "imminent and substantial endangerment to the public health or welfare or the environment" from a release or threatened release of a hazardous sub-

---

**3.** "Removal" is the cleanup or removal of released hazardous substances from the environment, typically a short-term measure, while a "remedial action" is an action of permanent remedy taken instead of or in addition to a removal action. *See* 42 U.S.C. § 9601(23)–(24); *Exxon Corp. v. Hunt,* 475 U.S. 355, 360, 106 S.Ct. 1103, 1108, 89 L.Ed.2d 364 (1986).

**4.** Any remedial action must be taken in accordance with the National Contingency Plan. *See* 42 U.S.C. § 9604(a); *see also City of New York v. Exxon Corp.,* 633 F.Supp. 609, 614 (S.D.N.Y. 1986).

**5.** Since the enactment of CERCLA, the EPA has identified 24,571 sites nationwide where release or threatened releases of hazardous substances may exist. *See* Undisputed Facts at ¶ 7. Of these, 850 are presently on the NPL and 150 additional sites have been proposed for listing. *See id.* at ¶ 8.

**6.** EPA's proof of claim in this proceeding seeks, *inter alia,* recovery of response costs incurred pre-petition at fourteen sites at which LTV has been identified as a PRP. *See* Undisputed Facts at ¶ 9. Eleven of these sites are on the NPL, one other is being considered for inclusion on the NPL, and at one site no additional response costs will be incurred. *See id.* at ¶¶ 10–11. The EPA has issued a ROD for only five sites where it anticipates that it will incur additional response costs, and has not decided on what remedial action is appropriate at eight sites. *See id.* at ¶¶ 12–13.

**7.** However, the liability is not absolute. A defendant may avoid liability if he sustains a burden of proving one of the defenses listed in 42 U.S.C. § 9607(b).

stance, the United States may bring an action to abate the danger or threat. 42 U.S.C. § 9606(a); *see Conservation Chemical, supra,* 619 F.Supp. at 191–97. Failure to comply with an order under this section can subject a party to liability for civil penalties. *See* 42 U.S.C. § 9606(b)(1).

*RCRA and Other Statutes*

The government also may seek relief under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* (1982 & Supp. V 1987), which governs hazardous wastes from generation through disposal. *See Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection,* 474 U.S. 494, 505–06, 106 S.Ct. 755, 761–62, 88 L.Ed.2d 859 (1986). Under the RCRA, the EPA may issue orders assessing civil penalties for past or present violations, require compliance with provisions of the act, or commence a civil action for injunctive relief. *See* 42 U.S.C. § 6928. In addition, the EPA may require an owner or operator or other responsible party to undertake corrective action for releases of hazardous waste. *See* 42 U.S.C. §§ 6924(v)–(w), 6973.

The government also asserts that it may be entitled to relief under the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.* (1988), the Clean Air Act, 42 U.S.C. § 7401, *et seq.* (1982 & Supp. V 1987), and the Federal Water Pollution Act, 33 U.S.C. § 1251, *et seq.* (1982 & Supp. V 1987). These statutes, unlike CERCLA, are regulatory and do not have provisions for the government to remedy a hazardous situation and then seek to hold responsible parties liable.

*New York State Law*

In addition to the federal environmental laws, NYS may seek relief under state environmental statutes. Under N.Y.Envtl.Conserv.Law § 71–2705 (McKinney 1984 & Supp.1990), violators of the provisions of New York statutes on hazardous waste management may be enjoined

from continuing the violation and may be subject to civil or criminal penalties. In addition, under N.Y.Envtl.Conserv.Law § 27–1313(3), NYS may order an owner or responsible party to remedy a hazardous situation at an inactive hazardous waste disposal site. If the responsible party fails to remedy the situation, the state may implement a remedial program and assess the costs on the responsible party. *See id.* at § 27–1313(5); *see generally Shore Realty, supra,* 759 F.2d at 1041 n. 11. NYS may also seek injunctive relief under state common law to abate a public nuisance.[8] *See State of New York v. Ole Olsen, Ltd.,* 35 N.Y.2d 979, 980, 324 N.E.2d 886, 886, 365 N.Y.S.2d 528, 529 (1975).

### DISCUSSION

The issue raised by these motions is the extent to which claims for the aforesaid injunctive relief, remedial and cleanup costs are dischargeable in bankruptcy. That issue raises two separate questions: 1) whether all such claims are encompassed by the broad definition of "claim" as set forth in the Bankruptcy Code, and 2) assuming arguendo that they are, whether the policy considerations underlying bankruptcy laws are outweighed by the need to protect the environment from hazardous waste.[9]

*CERCLA Obligations As "Claims" Under The Bankruptcy Code*

The Court starts, as it must, with the threshold question of whether the environmental claims at issue fit within the broad definition of "claim" set forth in the Bankruptcy Code, pursuant to which confirmation of a plan of reorganization discharges a debtor from liability on pre-petition claims. 11 U.S.C. § 1141 (1988); *see Beard v. A.H. Robins Co.,* 828 F.2d 1029, 1031 (4th Cir.1987). "Claim" is defined in section 101(4) of the Code as a

(A) right to payment, whether or not such right is reduced to judgment, liqui-

---

**8.** In addition, a damage award may be made if there is a public nuisance and that is the only appropriate remedy. *See State of New York v. Ole Olsen, Ltd.,* 38 A.D.2d 967, 968, 331 N.Y.S.2d 761, 764 (2d Dep't 1972).

**9.** These issues were expressly left unresolved by the Second Circuit in *Combustion Equipment, supra,* 838 F.2d at 38–39.

dated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

There can be little question that the definition of "claim" in the Bankruptcy Code is very broad, *see Ohio v. Kovacs*, 469 U.S. 274, 279 & n. 3, 105 S.Ct. 705, 707 & n. 3, 83 L.Ed.2d 649 (1985); *In re Robinson*, 776 F.2d 30, 34–35 (2d Cir.1985), *rev'd on other grounds sub nom. Kelly v. Robinson*, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986); *see also In re Remington Rand Corp.*, 836 F.2d 825, 826 (3d Cir.1988), and that Congress intended that "all legal obligations of the debtor, no matter how remote or contingent, [would] be able to be dealt with in the bankruptcy case." *See* H.R.Rep. No. 595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5963, 6266; S.Rep. No. 989, 95th Cong., 2d Sess., 21–22, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5807–08.

■ A contingent claim has been described as one in which "the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created." *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd*, 646 F.2d 193 (5th Cir.1981); *accord In re Crescenzi*, 53 B.R. 374, 380 (Bankr.S.D.N.Y. 1985), *aff'd*, 69 B.R. 64 (S.D.N.Y.1986).[10]

Because bankruptcy discharges liability only for claims that arose before the bankruptcy petition was filed, the focus of the Court's inquiry must be on when the CERCLA obligations arose. A claim, even a contingent claim, arises under the Bankruptcy Code at "the time when the acts giving rise to the alleged liability were performed." *In re Chateaugay Corp.*, 87 B.R. 779, 796 (S.D.N.Y.1988) (quoting *In re Johns–Manville Corp.*, 57 B.R. 680, 690 (Bankr.S.D.N.Y.1986)), *aff'd on other grounds sub nom. Pension Benefit Guaranty Corp. v. LTV Corp.*, 875 F.2d 1008 (2d Cir.), *cert. granted,* — U.S. —, 110 S.Ct. 321, 107 L.Ed.2d 311 (1989); *see also Grady v. A.H. Robins Co.*, 839 F.2d 198, 203 (4th Cir.1988), *cert. dismissed,* — U.S. —, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988); *In re Edge*, 60 B.R. 690, 701 (Bankr.M.D. Tenn.1986).[11] In *Chateaugay*, the bankruptcy claim for ERISA termination plan liability was held to arise with the creation and maintenance of a pension plan subject to ERISA termination liability provisions prior to the bankruptcy petition, *see Chateaugay, supra*, 87 B.R. at 797, while in *Grady* and *Edge*, the Courts held that the claim arose at the time of the act constituting the tort. *See Grady, supra*, 839 F.2d at 203; *Edge, supra*, 60 B.R. at 705.

In these cases, however, there was either (1) a contractual relationship between the debtor and those who might or might not sue him in the future based upon future events within the reasonable ambit of that contractual relationship; or (2) the commission of a tort by the debtor that could lead to some future injury and a consequent decision of the injured party to seek legal redress against the debtor. The liabilities imposed by CERCLA and other similar state and federal environmental statutes at

---

10. The Committee of Equity Security Holders has argued that both motions for summary judgment must be denied because the Court does not have a sufficient factual background to resolve these motions. The Court rejects this contention because a determination of whether environmental obligations are encompassed within the general definition of "claims" set forth in the Bankruptcy Code raises only a question of law.

11. The Court notes that these cases involved defining a claim for purposes of the automatic stay provisions of the Bankruptcy Act. *See, e.g., Grady, supra*, 839 F.2d at 203. However, there appears to be no basis to construe that provision differently for purposes of determining dischargeability.

issue here do not fit neatly within those parameters.

There is concededly no contractual relationship, such as an ERISA plan, to which a future contingent claim can be appended. Similarly, it is not clear that any tort, or indeed even a constituent element of any such tort, is properly chargeable to the debtor until there is either a release, or a threatened release, of hazardous waste. It follows that unless there has been a pre-petition release or threatened release of hazardous waste, which is a constituent element of CERCLA liability justifying governmental action, there is no pre-petition event as to which any post-petition contingent injury can properly attach. Thus, even construing the concept of a contingent claim as broadly as the case law permits, that concept cannot include a claim that is contingent not only upon the EPA's decision to seek remedial or removal action, but also upon the future post-petition occurrence of the only tortious conduct that could afford the basis for that future contingent claim.

In sum, before a contingent claim can be discharged, it must result from pre-petition conduct fairly giving rise to that contingent claim. *See In re Pettibone Corp.*, 90 B.R. 918, 931–32 (Bankr.N.D.Ill. 1988). The Court concludes, therefore, that in the absence of a pre-petition release or threatened release of hazardous waste, any subsequent liability for environmental

cleanup or remedial action is not dischargeable in bankruptcy.[12]

A comparison of this case with perhaps the broadest extension of the concept of contingent claim to which this Court has been cited serves to underscore the persuasiveness of that conclusion. In *In re Johns–Manville Corp.*, 36 B.R. 743 (Bankr. S.D.N.Y.1984), *aff'd*, 52 B.R. 940 (S.D.N.Y. 1985), the bankruptcy court appointed a representative for those persons who had been exposed to asbestos, but whose claims were not yet known. In providing for their representation, the bankruptcy court concluded that such persons possessed "claims" under the Bankruptcy Code.[13] *See id.* at 754–56 n. 6. Subsequently, a plan was approved by the Second Circuit which provided that such future claimants must satisfy their claims out of an Asbestos Health Trust, and, regardless of whether they technically held dischargeable "claims" under the Bankruptcy Code, were enjoined from suing the debtor. *See Kane v. Johns–Manville Corp.*, 843 F.2d 636, 640 (2d Cir.1988).[14]

Leaving aside for the moment the issue of whether such claims could be properly discharged because the unknown possible claimants might not have received proper notice of the bankruptcy proceeding, even in Johns–Manville's situation there was a pre-petition tortious event to which these indeterminate, and indeed indeterminable, claims could attach; *i.e.*, the manufacture of an inherently dangerous product to

12. Whether there has in fact been a pre-petition release or threatened release will undoubtedly raise factual issues as to specific claims which will need to be addressed in the bankruptcy proceeding. *See* 42 U.S.C. § 9601(22) (defining "release"); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 185–86 (W.D.Mo.1985) (same). However, those issues are not properly before the Court in this action for a declaratory judgment.

13. Leave to appeal this decision was originally denied. *See In re Johns–Manville Corp.*, 39 B.R. 234 (S.D.N.Y.1984). In a subsequent appeal, the district court, characterizing this conclusion as "dicta," affirmed the bankruptcy court because it concluded that the decision to appoint a representative for the future claimants was a "wise" exercise of discretion. The district court did so, however, on the understanding that the order

appointing the representative did not "carr[y] any implications as to the status or dischargeability of the claims of the future claimants." *In re Johns–Manville*, 52 B.R. at 942–43.

14. The injunction applied to any suit to recover "on or with respect to any Claim, Interest or Other Asbestos Obligation." *Kane, supra*, 843 F.2d at 640. The future claimants were holders of "Other Asbestos Obligation[s]," which were defined by the plan of reorganization as "asbestos related health liability caused by pre-petition exposure to Manville asbestos, regardless of when the individual develops clinically observable symptoms." *Id.* Thus, the future claimants were treated exactly as if they possessed "claims" under the Bankruptcy Code, although that issue was never decided in the proceedings to confirm the reorganization plan.

which the possible future claimants had been exposed. In this case, it is undisputed that the mere presence of hazardous wastes is not even a constituent element of any tortious conduct, much less a tort in itself. It follows that a discharge in bankruptcy cannot properly rest upon the mere pre-petition existence of such hazardous waste. Where, however, there has been a pre-petition release or threatened release of hazardous waste, there does exist an event that would render any claims arising from that circumstance dischargeable pursuant to the broad definition of "claim" set forth in the Bankruptcy Code.

The Court cannot accept the government's argument that any future environmental obligations are not dischargeable merely because a CERCLA cause of action fully arises only after a review has been made, a remedy chosen, and costs incurred.[15] So long as there is a pre-petition triggering event, *i.e.*, the release or threatened release of hazardous waste, the claim is dischargeable, regardless of when the claim for relief may be in all respects ripe for adjudication. Very frequently, only one part of a tort occurs pre-petition, with the injury occurring post-petition. Such claims are nonetheless dischargeable. *See Grady, supra,* 839 F.2d 201–03 (liability for injuries caused by Dalkon Shield arose as "claim" at time that the device was inserted into claimant even though the injury may have manifested itself later); *In re Johns–Manville Corp.,* 57 B.R. 680, 688 (Bankr.S.D.N.Y.1986) (claim for indemnification by contractor who installed defective building materials against manufacturer was a "claim" under Bankruptcy Code even though state court had not yet found contractors liable).

Since the Court concludes that some environmental claims are dischargeable, the Court must also determine what type of claims fit within that category, or put another way, whether claims for injunctive

relief based upon such pre-petition release or threatened release of hazardous waste are properly dischargeable.

*Discharge Of Claims For Injunctive Relief*

Under CERCLA and N.Y.Envtl. Conserv.Law § 27–1313, the responsible party may be required to remedy the hazardous situation, or the governmental entity may perform the removal or remedial action and then seek to recover those costs from the responsible parties. Since the Bankruptcy Code defines "claim" to include a "right to an equitable remedy for breach of performance if such breach also gives rise to a right to payment," *see* 11 U.S.C. § 101(4)(B), the Court must decide whether EPA's right to recover costs renders the injunctive remedies it may seek dischargeable claims within the meaning of that language.

The EPA argues that this is not a right to payment but merely a discretionary option which is part of the scheme of enforcement. That argument is not persuasive. Even an optional *right* to payment is nonetheless a right to payment and the fact that EPA may not choose to exercise that option in no way negates the existence of that right. It follows that absent any congressional intent to preclude the dischargeability of such claims, these claims for injunctive relief fall within the broad language of Section 101(4).

The Court also rejects EPA's argument that construing its option to seek payment as a claim under the bankruptcy law would undermine 42 U.S.C. § 9613(h), which precludes judicial review of any removal or remedial action until the EPA has taken some action, and limits any judicial review to the administrative record. *See id.* at § 9613(j). Construing the Bankruptcy Code to render such injunctive claims dischargeable does not involve an assessment of the correctness or incorrectness of

---

**15.** Plaintiffs rely on several cases decided under the Bankruptcy Act, which required provability of a claim before it could be discharged. *See Schweitzer v. Consolidated Rail Corp.,* 758 F.2d 936, 942 (3d Cir.), *cert. denied,* 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985); *In re Mooney*

*Aircraft, Inc.,* 730 F.2d 367, 375 & n. 6 (5th Cir.1984); *In re Gladding Corp.,* 20 B.R. 566, 568 (Bankr.D.Mass.1982). Those cases are no longer apposite because the concept of provability has been abandoned in the new Bankruptcy Code.

the EPA's decision to seek payment and therefore does not in any sense constitute a review of agency action.[16]

However, where there is no right to such payment for cleanup or other remedial costs, claims for injunctive relief do not fall within the Bankruptcy Act and are not dischargeable. *See, e.g.,* 42 U.S.C. §§ 6928 & 6973 (RCRA); 42 U.S.C. § 9606 (CERCLA injunctive provision); N.Y.Envtl.Conserv.Law § 71-2705. These statutes provide for injunctive relief followed by civil penalties for non-compliance; they do not provide for government cleanup followed by an assessment of damages on responsible parties.[17]

The Court cannot accept LTV's argument that injunctive actions to remedy situations resulting from pre-petition conduct are dischargeable even if the only relief that may be sought is an injunction, merely because the debtor would be required to expend money in order to comply with the injunction. To accept that argument would render dischargeable any claims for injunctive relief other than those merely seeking the cessation of some unlawful activity.[18] Such a reading would render the right to payment language set forth in the statute superfluous and would thus hardly be consistent with congressional intent.

*Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), does not detract from the Court's conclusions. In that case, the State obtained an injunction ordering an individual to clean up a hazardous waste site and after he failed to comply, a receiver was appointed to take possession of the individual's property. Under those unusual circumstances, where the debtor no longer had the ability to comply with the injunction, and where the state conceded it could no longer obtain its injunctive relief, the Court found that the claim for injunctive relief had been transformed into a dischargeable money judgment even though initially the state might not have had a right to payment. *See id.* 469 U.S. at 276–77, 282–83, 105 S.Ct. at 706–07, 709–710. However, the Court noted that the legislative history of the Bankruptcy Code indicated that a judgment of specific performance would be a "claim" for purposes of bankruptcy law if the state's law allowed it to be satisfied by a monetary payment if performance was refused. *See id.* at 280 & n. 8, 105 S.Ct. at 708 & n. 8. Thus, where a creditor has the option of converting an injunction into a right to monetary compensation, as the EPA can here if it performs the cleanup because of a PRP's failure to do so, such an obligation must be regarded as a dischargeable claim.

Therefore, *Kovacs* clearly does not support the broad contention made here that a debtor still capable of complying with an injunction may seek discharge merely because it may have to spend money to do it.[19] *See id.* at 282–83, 105 S.Ct. at 709–10. In fact, the Supreme Court specifically noted that some forms of liability under the

---

**16.** NYS also raises the argument, as does amicus Commonwealth of Pennsylvania, that their claims are not dischargeable because their state statutes allow the state to remedy the situation and charge the responsible parties only where they have not complied with the order granting injunctive relief. The Court does not accept that argument. A right to payment, even if it can only be exercised under certain conditions, is nonetheless a right to payment and thus falls within the definition of claims set forth in the Bankruptcy Code.

**17.** The fact that monetary penalties are available under these statutes if a party fails to comply with the injunction does not render these injunctive claims dischargeable. Such penalties, if imposed, are, at best, analogous to a contempt citation issued to force a party to comply with a court order. They do not provide an alternative right to compensatory payment for the cost of the cleanup.

**18.** Moreover, the argument, if taken to its logical conclusion, would render all claims for injunctive relief dischargeable since an argument could always be made that there is some cost associated with any claim for injunctive relief, even one that does not seek any affirmative corrective action, *i.e.,* legal fees or costs of the litigation.

**19.** The Court therefore declines to follow *United States v. Whizco,* 841 F.2d 147 (6th Cir.1988), relied upon by LTV, where the Sixth Circuit concluded that because an individual debtor would be required to expend money to comply with an injunction, a claim for injunctive relief only could be discharged. *See id.* at 150.

**524**

environmental laws, such as injunctions directing a debtor to cease polluting, were not dischargeable. *See id.* at 285, 105 S.Ct. at 7.

*The Policies Underlying The Environmental Laws And The Bankruptcy Laws*

■ Having concluded that claims arising out of pre-petition release or threatened release of hazardous waste, including claims for injunctive relief where there is a right to payment, are dischargeable under the Bankruptcy Act,[20] the Court must next address the question left open by the Second Circuit in *Combustion Equipment:* whether the policies underlying the statutes protecting the environment foreclose the dischargeability of such claims. For the reasons which follow, the Court concludes that they do not.

■ First, the Bankruptcy Code manifests a strong and clearly expressed congressional intent that a debtor be discharged from all claims, both actual and contingent, which arise out of pre-petition conduct. Moreover, the courts have effectuated that congressional intent by, as noted above, construing the concept of "claim" very broadly. Therefore this Court may not and should not subvert that policy by judicially created exceptions not clearly supported by the bankruptcy statute itself or by other congressional legislation.

In that regard, it is significant that the Bankruptcy Code itself specifically defines classes of claims that cannot be discharged, *see* 11 U.S.C. § 523, and in a reorganization context specifically limits these exceptions to individual debtors. *See* 11 U.S.C. § 1141(d)(2) ("[t]he confirmation of a plan does not discharge an *individual* debtor from any debt excepted from discharge under section 523 of this title") (emphasis added); *In re A.H. Robins Co.,* 59 B.R. 99,

103–04 (Bankr.E.D.Va.1986), *aff'd,* 828 F.2d 1029 (4th Cir.1987). Moreover, courts have strictly construed these exceptions in order to fulfill the Bankruptcy Code's policy of affording a debtor a fresh start. *See, e.g., In re Vickers,* 577 F.2d 683, 687 (10th Cir.1978); *In re Costantino,* 72 B.R. 189, 190–91 (Bankr.D.S.C.1986).

In addition, courts have required a clear manifestation of congressional intent in order to find that a debt is not dischargeable because of other statutory policies. *See Chateaugay, supra,* 87 B.R. at 798 (finding no such intent with respect to ERISA liabilities); *see also United States v. Whiting Pools, Inc.,* 462 U.S. 198, 209, 103 S.Ct. 2309, 2315, 76 L.Ed.2d 515 (1983) ("[n]othing in the Bankruptcy Code or its legislative history indicates that Congress intended a special exception for the tax collector in the form of an exclusion from the estate of property seized to satisfy a tax lien"). Here there is nothing in either the bankruptcy or environmental statutes themselves which sets forth a clearly expressed congressional intent that claims for contingent cleanup and remedial costs should not be dischargeable.[21]

Nor has the Court been given any persuasive argument why, in the absence of a manifest congressional intent, an exemption from the broad definition of claims set forth in Section 101 should be judicially implied. At best, the Court has been told that it will be administratively difficult for state and federal environmental agencies to determine and select which sites should be subject to enforcement action and what remedies should be pursued as to each because of the large number of potentially hazardous sites. However, these problems can be dealt with by increasing the resources assigned to such tasks, and by

---

**20.** In view of the Court's conclusion that all other claims are not dischargeable, the Court need not address this issue specifically as to such non-dischargeable claims although it would seem that the same analysis would apply to these claims as well.

**21.** *See also In re The Charter Co.,* 862 F.2d 1500 (11th Cir.1989), where the Eleventh Circuit held that third-party claims against a debtor for contribution and indemnification of CERCLA liabil-

ity were subject to 11 U.S.C. § 502(e)(1)(B) (1988), which provides that the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor if the claim is contingent. That court also concluded that disallowance of claims brought under CERCLA, *i.e.,* third-party claims, *see* 42 U.S.C. § 9613(f)(1) (Supp. V 1987), would not contravene the policies that underly the environmental laws. *See id.* at 1504.

appropriating sufficient funds for that purpose. They hardly suffice as a basis to ignore the debtor's right to reorganize its affairs in a rational way and to emerge from bankruptcy with some certitude as to whether it can continue its business free from subsequent enforcement actions arising from its pre-petition conduct.

▮ In any event, those administrative difficulties are more properly directed to Congress, which may, if it chooses, provide appropriate legislative redress. They are not and should not be a basis for this Court to imply an exception to the Bankruptcy Code which Congress has not yet seen fit to enact. Nor is there any great need to imply such an exception. To the extent that a debtor continues to own or operate sites containing hazardous wastes, which *post-petition* create a danger of release or threatened release of those wastes, that post-petition ownership can be a proper basis for enforcement action notwithstanding any previous discharge in bankruptcy. Indeed, implicit in this Court's holding that claims arising out of mere ownership of sites containing hazardous wastes are not dischargeable is the necessary assumption that when those sites reach the stage where there is a release or threatened release of hazardous wastes, then at that point they may properly be subject to enforcement action.

▮ This is especially true since the debtor, post-petition, cannot abandon a site as to which there is a release or threatened release of hazardous waste. *See Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protec.*, 474 U.S. 494, 506–07, 106 S.Ct. 755, 761–62, 88 L.Ed.2d 859 (1986). Thus, if and when these sites become ripe for enforcement action, the EPA may act to protect the environment and the debtor cannot avoid its post-petition responsibilities by transferring or abandoning these sites.

It follows that the only burden placed on the EPA by this Court's ruling is the burden of promptly ascertaining those sites as

to which there has been either a pre-petition release or threatened release of hazardous waste, and asserting its claims with respect to those sites. The Bankruptcy Court may then provide for an appropriate reserve in the bankruptcy plan to fund the cost of cleanup or other remedial action at those sites.

*Administrative Priority*

▮ The Court must also address the question, raised by the EPA's action for a declaratory judgment, as to whether cleanup costs assessed post-petition with respect to sites presently owned by LTV [22] where there has been a pre-petition release or threatened release of hazardous wastes, should be afforded an administrative priority.

11 U.S.C. § 503(b)(1)(A) provides that "actual, necessary costs and expenses of preserving the estate" are entitled to an administrative priority. To the extent that LTV continues to own and operate sites post-petition where there has been a release or threatened release of hazardous waste, LTV is, under the law, under a continuing obligation to comply with the environmental laws, and indeed, as noted above, may not even be permitted to transfer or abandon those sites if they pose a danger to the public interest. *See Midlantic, supra*, 474 U.S. at 506–07, 106 S.Ct. at 762–63. It follows that monies spent to comply with environmental laws post-petition as to such sites would be "actual and necessary costs and expenses of preserving the estate" and therefore entitled to an administrative priority. *See In re Smith-Douglass, Inc.*, 856 F.2d 12, 17 (4th Cir. 1988); *In re Wall Tube & Metal Prods. Co.*, 831 F.2d 118, 123–24 (6th Cir.1987); *In re Peerless Plating Co.*, 70 B.R. 943, 948–49 (Bankr.W.D.Mich.1987); *In re Stevens*, 68 B.R. 774, 783 (D.Me.1987). In addition, for the same reasons, civil penalties for post-petition violations would also be entitled to be treated as administrative expenses. *See United States Dept. of Interi-*

---

**22.** The EPA has not sought a declaratory judgment as to the treatment of CERCLA costs relating to property not owned by the debtor.

*or v. Elliott,* 761 F.2d 168, 172 (4th Cir. 1985) (Under Bankruptcy Act).

## CONCLUSION

For the foregoing reasons, the cross-motions are granted in part and denied in part. The Court's conclusions are as follows: a claim for compensation under CERCLA is not dischargeable in bankruptcy unless there has been a pre-petition release or threatened release of hazardous waste; where there has been such a pre-petition release or threatened release, injunctive relief that provides that a defendant who fails to comply may be liable for the costs of cleanup is dischargeable in bankruptcy; injunctive relief that does not so provide may not be discharged even if it provides for punitive civil penalties for non-compliance; the policies underlying the environmental laws are not contravened by allowing a debtor to be discharged from liability pursuant to the Bankruptcy Code; and cleanup costs assessed post-petition where there has been a pre-petition release or threatened release of hazardous waste are entitled to an administrative priority under the Bankruptcy Code. The Clerk of the Court is hereby directed to close the above-captioned actions.

It is SO ORDERED.