JACK R. MILLER, Circuit Judge.
This appeal is from the judgment of the United States Claims Court (2 Cl.Ct. 574 (1983)) that August Urbanek and the estate of his deceased wife, Irene Urbanek (with whom August Urbanek filed a joint income tax return) recover from the United States only the sum of $69,358.46 in tax, $693.59 in assessed penalties, $15,889.27 in interest paid, plus interest on the foregoing as provided by law together with costs to the defendant, for the calendar year 1972. The suit was based on a 1977 Notice of Disallowance of August and Irene Urbanek’s claim for refund of $173,268.43 plus interest. The $173,268.43 comprised a disputed deficiency in income tax of $139,897.46, interest of $31,972, and a late payment penalty of $1,398.97. The deficiency in income tax was based on August Urbanek’s 50% distributive share of asserted additional income of a partnership from the sale of condominium units.[1] We affirm.
The factual background of this case found by the Claims Court rests on the stipulation of the parties and is set forth below (footnotes omitted).
In 1969, taxpayer, August Urbanek, formed a partnership to develop a 5.5 acre tract of land [in Boca Raton, Florida]. The project called for the construction of two condominium towers on .9 acre located roughly in the middle of the tract. On the surrounding land, the part *872 nership constructed various amenities such as a parking lot, a putting green, a swimming pool and a marina.
Sales of condominium units followed a pattern which was not uncommon to developments in Florida in the 1970s. Each buyer received fee simple title to his condominium and to a pro rata share of a package consisting of the land on which the towers were located, of a road connecting the towers with the public street and of the amenities. The partnership retained title to the approximately 4.6 acres which surrounded the towers and upon which the amenities were situated. The retained land was leased for 99 years to the Boca Towers Condominium Association, a nonprofit Florida corporation formed by the taxpayer and his partner in 1971.
The association agreed to a yearly net rental of approximately $160,000, with periodic increases geared to the consumer price index. The lease was negotiated between the partnership and the association at a time when the taxpayer and his partner were in control of both. Buyers of condominium units were required to become members of the association and to assume a pro rata share of the ground lease. Each buyer pledged his condominium as security for performance of his obligations under the lease.
At that time, Boca Raton limited the density of residential construction to 50.7 units per acre. This meant that the larger a tract of land a developer had, the more condominium units he could build. Construction did not, however, have to be evenly distributed over the tract. As in this case, the residential units could be concentrated in high-rise towers on a small portion of the land, so long as sufficient total land was dedicated to the project.
The partnership sold the condominium units starting in 1972. In calculating the gain from the sale of these units, the taxpayer subtracted from the sales price the cost of the .9 acre of land on which the towers were situated, plus the full cost of erecting the towers and the amenities. The government challenges this method of computation. In the government’s view, the combined sale/lease package offered to prospective buyers enabled the taxpayer to defer some immediate income from the sale by converting sale proceeds into lease payments, thereby diminishing the effects of the progressive income tax. The government proposes to remedy this problem by reallocating some of the cost of construction to the lease, thereby lowering the cost of the units sold and commensurately raising the taxpayer’s [sic partnership’s] gain. The government relies upon Welsh Homes, Inc. v. Commissioner, 279 F.2d 391 (4th Cir.1960), and the reallocation formula adopted in that case (now commonly known as the Welsh Homes formula).
The Claims Court awarded Urbanek only $85,941.32 ($69,358.46 in overpaid tax, $693.59 in overpaid penalties, $15,889.27 in overpaid interest, plus interest on the foregoing, of the $173,268.43 plus interest in suit. Costs of $219.41 were awarded the Government.
OPINION
The Claims Court found that the partnership’s allocation of only the cost of the 4.9 acres of raw land to the leased land “does not reflect reality because the value of the lease — and the rent it commanded— reflected the expenses incurred on the project as a whole, not merely the cost of buying the land.” We are satisfied that appellant has not shown that this finding is clearly erroneous. Heisig v. United States, 719 F.2d 1153, 1158 (Fed.Cir.1983). Our conclusion is stated with full recognition that the bona fides of appellant’s method is not in question. However, irrespective of tax avoidance (or postponement[2]) *873 considerations, reallocation may be deemed proper. Central Cuba Sugar Co. v. Commissioner, 198 F.2d 214, 215 (2d Cir.1952). Proper accounting practice is to allocate costs to fairly match such costs with related revenues. Seidler and Carmichael, ACCOUNTANTS’ HANDBOOK (1981), 20-31; Davidson and Weil, HANDBOOK OF MODERN ACCOUNTING (1977), 17-14.[3] Thus, the Claims Court found that allocation of only the cost of the 4.9 acres of raw land to the leased land did not “fairly match” (i.e. “reflect reality”) the costs incurred on the project as a whole with the rental revenue and condominium sales proceeds related to such costs.
Nor has appellant shown that the method of allocation used by the Claims Court, which the Government asserted in its amended answer to appellant’s petition, does not clearly reflect income. Appellant’s burden to show an abuse of discretion is a heavy one. See Brown v. Helvering, 291 U.S. 193, 203, 54 S.Ct. 356, 360, 78 L.Ed. 725 (1934) (citing, inter alia, Lucas v. American Code Co., 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 (1930)); Lucas v. Structural Steel Co., 281 U.S. 264, 271, 50 S.Ct. 263, 265, 74 L.Ed. 848 (1930); Morgan Guaranty Trust Co. of New York v. United States, 585 F.2d 988, 997, 218 Ct.Cl. 57 (1978). See also I.R.C. § 446(b); cf. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 546, 99 S.Ct. 773, 788, 58 L.Ed.2d 785 et seq. (1979). The taxpayer’s argument (and the dissenting opinion’s position) that the tax law allows a taxpayer to deduct as costs of goods sold all actual expenditures incurred in acquiring and improving property merely begs the question of what costs are properly allocable to the condominiums. Those costs that are properly allocable are obviously deductible as costs of goods sold.
Appellant argues that the Government’s formula distorts income by allocating costs in proportion to fair market value of the interests sold and retained. However, such a method of allocation is in accord with correct accounting practice. Thus, Seidler and Carmichael, ACCOUNTANTS’ HANDBOOK, supra, states:
The value method [of allocating costs] is most commonly used. Under this method, the allocation of costs is based on relative values, such as estimated sales prices or appraised values.
Davidson and Weil, HANDBOOK OF MODERN ACCOUNTING, supra, teaches:
The various methods used for this allocation include ... value methods (mortgage release prices, estimated selling prices, or appraisals)____
Morrison and Cooper, FINANCIAL ACCOUNTING (1975), 283, in discussing “basket” purchases, says:
A method which is commonly employed to allocate the total acquisition cost to the individual assets involves estimating the current values of the individual assets, and prorating the cost to each asset according to the proportion of its current value to the total current value of all the assets acquired.
The value method of allocation was recognized by this court’s predecessor in Du Pont de Nemours & Co. v. United States, 471 F.2d 1211, 1220 (Ct.Cl.1973), which describes Welsh Homes, Inc., supra, as an example of eases reaching “satisfactory solutions” in allocating costs between retained and transferred interests. See also Biscayne Bay Island Co., 23 B.T.A. 731, 735 (1931).
Appellant further argues that if any reallocation is made, it should be limited to the cost of the amenities constructed on the leased land. However, as found by the *874 Claims Court, the expenditures which the partnership had incurred to improve the interest that was sold (namely the condominium complex and the amenities) also materially enhanced the rentability of the leased interest, which could not have been rented at the rates set but for such expenditures.
Therefore, we hold[4] that the Claims Court correctly determined that the cost of the condominium complex and the amenities should be allocated to both the condominium complex and the leased land retained by the partnership, according to their respective values.[5]
The dissenting opinion cites “uncontradicted evidence at trial [establishing] that the sale/ground lease arrangement used by the taxpayer was prevalent in the Boca Raton area,” but such evidence does not indicate what allocation methods were used in those arrangements and whether or not the Government approved them. Even if they had used an allocation method similar to the one used by Urbanek and it could be shown that this passed muster on audit by the Internal Revenue Service, that would not tie the Government’s hands in this case. Mertens, LAW OF FEDERAL INCOME TAXATION (1976; 1983 Supp.) §§ 6015-6017; see also Carlton’s Estate, 298 F.2d 415, 419 (2d Cir.1962). Accordingly, the suggestion that the Government’s position here represents a “sweeping change in the taxation of condominium sales” that should emanate only from the Congress is not well taken.
Finally, appellant argues that, alternatively, the partnership is entitled to depreciate any construction costs reallocated to the leased land, citing Treas.Reg. § 1.167(a)-4.[6] However, the key phrase in the regulation is “if subject to depreciation allowances,” and appellant merely begs the question by his reliance on the regulation. We are satisfied that the Claims Court correctly held that the reallocated costs are not subject to depreciation allowances. As the court pointed out, the condominium complex and amenities merely lend an “intangible benefit” (enhanced rentability) to the leased land and are not a part of it, and it was the partnership that severed ownership of the land from ownership of the improvements, leaving it nothing to depreciate. See F.M. Hubbell Son & Co. v. Burnet, 51 F.2d 644, 645 (8th Cir.1931).[7]
*875 In view of the foregoing, the judgment of the Claims Court is affirmed.
AFFIRMED.

. Urbanek’s share of the asserted additional income was $270,158.

. The Claims Court remarked: "Of course, since the taxpayer sold the 4.6 acres in a later tax year, he was entitled to add those [reallocated] *873 costs to his basis in the land and thereby lower his gain from that sale.”

. We take judicial notice of authoritative texts cited herein. Werk v. Parker, 249 U.S. 130, 132-33, 39 S.Ct. 197, 198, 63 L.Ed. 514 (1919); Nippon Kogaku (USA), Inc. v. United States, 673 F.2d 380, 382 (CCPA 1982); Schott Optical Glass, Inc. v. United States, 612 F.2d 1283, 1285, 67 CCPA 32 (1979); In re Moureu, 345 F.2d 595, 597 n. 4, 52 CCPA 1363 (1965); In re Hartop and Brandes, 311 F.2d 249, 253, 50 CCPA 780 (1962); In re Eisenhut, 245 F.2d 481, 483 n. 2, 44 CCPA 974 (1957).

. The dissenting opinion misstates the holding, which is premised on basic tax law and not on the circumstances of Maryland ground rent law, which was involved in Welsh Homes.

. The Claims Court explained that, under its method, the sales price of the units is divided by the aggregate value of the entire property, which consists of the sales price plus the value of the lease (i.e., the capitalized value of the lease, which the court determined to be nine times the annual rent to be received from the owners of the 108 units sold in 1972). The parties have apparently agreed to the following computation if the value method for allocation is held to be applicable:
COMPUTATION OF "COST OF CONDOMINIUMS SOLD" PER CLAIMS COURT RULING
Value of Interest Sold (Sales per return) $ 3,559,050.00
Value of Interest Retained $63,180 annualized rentals x 9 $ 568,620.00
Aggregate Value of Interests Sold and Retained $ 4,127,670.00
Ratio of Interest Sold to Aggregate Value = $3,559,050.00 = .8622418
$4,127,670.00
Cost of Improvements $ 2,931,710.79
Cost of Land $496,941.06 x 108 272 $ 197,314.83
Aggregate Costs $ 3,129,025.62
Multiply by Ratio of Value of Interest Sold to Aggregate Value .8622418
Cost of Goods Sold Per Court’s Opinion $ 2,697,976.00
Cost of Goods Sold Per Return $ 3,030,368.00
Cost of Good[s] Sold Per Court $ 2,697,976.60
Adjustment to Partnership Return 332,391.40 $
Multiplied by Plaintiffs’ Interest .50 .50
Plaintiffs’ Share of Adjustment $ 166,195.70

. The regulation provides in pertinent part: Capital expenditures made by a lessor for the erection of buildings or other improvements shall, if subject to depreciation allowances, be recovered by him over the estimated life of the improvements without regard to the period of the lease. [Emphasis added.]

. Like the Claims Court, “Insofar as D. Loveman & Son Export Corp. v. Commissioner, 34 T.C. 776, 806-08 (1960), aff’d 296 F.2d 732 (6th Cir. [1961]), cert. denied 369 U.S. 860, 82 S.Ct. 950, 8 L.Ed.2d 18 (1962), may be read as suggesting that a taxpayer can depreciate an asset he does not own, the court is unpersuaded and declines to follow.”