**In re DOW CORNING CORPORATION, Debtor.**

**Bankruptcy No. 95–20512.**

United States Bankruptcy Court, E.D. Michigan, Northern Division.

Dec. 1, 1999.

See also 244 B.R. 718; 244 B.R. 634; 244 B.R. 673; 244 B.R. 678; 244 B.R. 696; 244 B.R. 721.

### *AMENDED OPINION REGARDING CRAMDOWN ON CLASS 15*

ARTHUR J. SPECTOR, Chief Judge.

The Debtor and the Official Committee of Tort Claimants negotiated and on November 9, 1998 filed a Joint Plan of Reorganization. The plan (hereafter referred to simply as the "Plan") was subsequently amended on February 4, 1999 and modified various times. The hearing on confirmation of the Plan commenced on June 28, 1999 and closing arguments were heard on July 30, 1999. Several post-hearing briefs and other submissions were received and the Court took the matter under advisement.

On this date the Court issued its Findings of Fact and Conclusions of Law on the matter of the confirmation of the Plan. This opinion is one of several which will

serve to supplement and explicate some of the findings and conclusions. At least one opinion will follow later.

A general overview of the Plan's terms is contained in the opinion on classification and treatment issues. When necessary, additional Plan terms are explained here. Except where otherwise stated, all statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

Class 15 rejected the Plan and the Proponents seek confirmation pursuant to 11 U.S.C. § 1129(b)(1). The Court concludes that the Plan does not unfairly discriminate against and is fair and equitable to Class 15. Accordingly, the requirements of cramdown are satisfied.

## I. Overview of Class 15

Class 15 consists of claims filed by governments seeking to recover the costs of medical treatment that they either paid for or provided as a result of injuries allegedly caused by products, including breast implants,[1] manufactured by, or containing materials supplied by, the Debtor. There are three claimants in this class, the Canadian Province of Alberta, the Canadian Province of Manitoba and the United States of America. Alberta and Manitoba each filed one claim and both voted to accept the Plan. Class 15 was a rejecting class, however, because the United States, which holds four claims,[2] voted to reject the Plan.

With respect to Class 15 claims, the Plan provides:

Unless a different treatment is agreed to by the Proponents and the affected Claimants, the Proponents shall seek to have the Claims in Class[ ] 15 ... estimated for distribution on or before the Confirmation Date. The Estimated Amount of any such Claim will be paid ... by the Claims Administrator on, or as soon as practicable after, the Effective Date. If not estimated for distribution on or before the Confirmation Date, such Claims will be channeled to the Litigation Facility for purposes of Claim liquidation and paid (subject to the terms of the Settlement Facility Agreement and the Funding Payment Agreement) when Allowed.

*Plan* § 5.13.5.

Alberta, Manitoba and the Proponents have effectively agreed to different treatment than the channeling of their claims to the Litigation Facility. Alberta and Manitoba will forgo pursuit of their direct claims against the Debtor, at least for the present, in favor of certain treatment that their claims will be afforded pursuant to the British Columbia Class Action Settlement Agreement ("B.C. Agreement"). The B.C. Agreement, which stems from a class action lawsuit brought against the Debtor and its Canadian subsidiary by breast-implant claimants residing in certain Canadian provinces, is implicitly incorporated into the Plan at § 5.7.

The United States, however, has not reached agreement with the Proponents on treatment that is different from that provided under the Plan. And it is apparent that the Proponents will not seek to estimate the United States' claims prior to the Confirmation Date. Consequently, upon confirmation, the Government's claims are channeled to the Litigation Facility for resolution. Any Government claim subsequently allowed through the Litigation Facility will be paid in full, with interest, by

---

1. The United States limited its proofs of claim to reimbursement for medical expenses involving only breast implants. Hereafter, this opinion generally refers to breast-implant claims to the exclusion of all other personal injury claims which are part of Class 15. However, the discussion over this portion of the Government's claims that have been disallowed pertains to all the personal injury claims which comprise its claims.

2. The United States filed proofs of claims on behalf of: Department of Defense ("DoD"); Department of Veteran's Affairs ("VA"); Indian Health Services division of Department of Health and Human Services ("IHS"); and Health Care Financing Administration ("HCFA").

the Settlement Facility in cash. *Amended Joint Disclosure Statement With Respect to Amended Joint Plan of Reorganization* ("*Disclosure Statement*") § 6.6(G)(4); *Settlement Facility Agreement* § 3.02(a)(ii).

## II. Discussion

■ A plan of reorganization can be crammed down on a rejecting class if all of the requirements of § 1129(a), save for (a)(8), are satisfied and "the plan does not discriminate unfairly, and is fair and equitable" to the rejecting class. 11 U.S.C. § 1129(b)(1); *see also In re Crosscreek Apartments Ltd.*, 213 B.R. 521, 532–32 (Bankr.E.D.Tenn.1997). The Proponents have the burden of showing by a preponderance of the evidence that all of the requirements of § 1129(b)(1) have been satisfied with respect to Class 15. *In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 479 (Bankr.E.D.Mich.1995). For the reasons stated below, the Proponents have satisfied this burden.

### A. Unfair Discrimination Test

■ Section 1129(b)(1) prohibits discrimination against a non-accepting class only when that discrimination is "unfair." *See* 11 U.S.C. § 1129(b)(1); *Crosscreek*, 213 B.R. at 537; 7 *Collier on Bankruptcy* ¶ 1129.04[3] (15th ed. rev.1999). The Bankruptcy Code does not define what constitutes "unfair discrimination." As a result, courts have developed a number of tests designed to answer this question. *See, e.g., In re Aztec Co.*, 107 B.R. 585, 590 (Bankr.M.D.Tenn.1989); 7 *Collier on Bankruptcy* ¶ 1129.04[3][a]. In its basic form, however, the prevailing view is that a plan will not unfairly discriminate if there is "a rational or legitimate basis for discrimination and [if] the discrimination [is] . . . necessary for the reorganization."

*Crosscreek*, 213 B.R. at 537; 7 *Collier on Bankruptcy* ¶ 1129.04[3][a].

In a sister opinion pertaining to the Proponents' request to cram down Class 18, the Court thoroughly analyzed the various formulations and concluded that the most succinct and logical formulation is stated in an article by Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11* ("*A New Perspective*"), 72 Am. Bankr.L.J. 227 (1998).

■ Using this approach, a rebuttable presumption that a plan is unfairly discriminatory will arise when there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution. *See* Markell, *A New Perspective*, 72 Am. Bankr.L.J. at 228.

■ The first Markell factor is, of course, established by the fact that Class 15 rejected the proposed Plan. With respect to the second factor, the United States points to Class 14 as providing the proper basis of comparison.[3] *Memorandum of Law in Support of the United States' Objection to Joint Plan of Reorganization* ("*U.S. Memorandum of Law*") at 12. Class 14 is composed of domestic health insurers that seek reimbursement for costs incurred as a result of treatment provided to individuals allegedly injured by breast implants either manufactured by the Debtor or containing materials sup-

---

**3.** The United States also argued that its claims are unfairly discriminated against as compared to the other Class 15 claims held by Alberta and Manitoba. The unfair discrimination test compares the treatment of the rejecting class as a whole with the treatment provided to other classes. Questions of within-class treatment are irrelevant to this analy-

sis. Rather, such objections are addressed under § 1123(a)(4), which requires all claims within a class to be "provide[d] the same treatment." The United States' § 1123(a)(4) objections are addressed in a separate opinion along with other within-class treatment objections and § 1122(a) claim-classification objections.

plied by the Debtor. *Plan* §§ 1.55 & 5.13.3. The treatment extended to Class 14 and Class 15 claimants under the Plan is identical with one exception. Negotiations between the Proponents and certain Class 14 claimants resulted in a lump sum settlement offer from the Debtor. All Class 14 members will be able to choose the settlement option. *Id.* § 5.13.3. Those who do will then share in the lump sum settlement fund *pro rata*. *Id.*

■ Even assuming Class 14 forms the proper basis of comparison, Class 15 claimants will neither receive a materially lower percentage recovery under the Plan than Class 14 claimants, nor will they suffer a greater risk of non-payment under the Plan than Class 14 claimants. To begin with, Class 15 claimants and Class 14 claimants who opt for litigation will receive identical percentage recoveries under the Plan. And that percentage recovery will be 100% of the allowed amounts of their claims. In contrast, Class 14 claimants who elect to settle will be accepting a payment that is something less than what they believe to be the full value of their claim in order to avoid the risks associated with litigation. The upshot is that Class 15 claimants actually stand to obtain a much higher percentage of recovery than settling Class 14 claimants. In addition, Class 14 and Class 15 claimants share identical risks with respect to the nonpayment of their claims. Fortuitously, that risk is effectively zero, for all claimants in both classes will be paid the full amount of their allowed claims in cash from the Settlement Facility. For these reasons, a presumption that the Plan unfairly discriminates against Class 15 does not arise.

■ Were the Court to apply the more commonly-accepted test of what constitutes unfair discrimination, we would reach the same conclusion. One of the goals of the chapter 11 process is to consensually resolve claims pending against the debtor. Thus, the Proponents have a perfectly legitimate reason for attempting to resolve Class 14 claims through settle-

ment. The fact that the Proponents have tried but failed to reach a settlement with the United States does not change this fact. Thus, there is a rational, legitimate basis for the different treatment extended to Class 14 claimants than Class 15 claimants. Moreover, a plan of reorganization must provide mechanisms for resolving all claims against the debtor. When those claims are disputed, the two possible avenues of resolution are settlement or formal adjudication. Accordingly, the treatment extended to both Class 14 and 15 claimants is necessary for the Debtor's reorganization. For these reasons, the Proponents have satisfied their burden of showing that the Plan does not unfairly discriminate against Class 15.

## B. Fair and Equitable Test

Section 1129(b)(2) list criteria for determining whether a plan is fair and equitable to a rejecting class of unsecured creditors. That section provides:

(2) For purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B).

■ Generally, a plan is fair and equitable if either subsection is satisfied. As previously indicated, unless different treatment is otherwise agreed to, all Class 15 claims are channeled to the Litigation Facility for resolution. *Plan* § 5.13.5. If

a Class 15 claimant prevails at trial, its claim will be allowed for the amount of the judgment. The allowed Class 15 claim will then be paid in full with interest by the Settlement Facility in cash. *See Disclosure Statement* § 6.6(G)(4); *Settlement Facility Agreement* ¶ 3.02(a)(ii). Since Class 15 claimants who obtain judgments against the Litigation Facility will be paid in full, the Plan clearly, or so it would seem, satisfies the requirements of the first subsection, § 1129(b)(2)(B)(i).

The United States, however, argues otherwise. It contends that it has numerous and valuable claims against the Settlement Facility that are being eliminated under the Plan for no consideration. The Plan gives women with breast-implant claims against the Debtor the opportunity to either settle or litigate their claims. Those choosing to settle will have their claims channeled to the Settlement Facility. The United States reasons that every time a settling breast-implant claimant for whom it has a potential right of subrogation sits down at the negotiating table with the Settlement Facility, it should have a right to sit down with them. And every time the Settlement Facility reaches a settlement with such a breast-implant claimant, the United States asserts that it should be able to take its cut off the top. The Plan, however, does not overtly grant the United States the ability to do this, and because of this fact the United States argues that its claims against the Debtor are not being paid in full.

■ There are several significant problems with the United States' theory. Its claims are founded upon two non-bankruptcy federal statutes. The Federal Medical Care Recovery Act ("FMCRA"), 42 U.S.C. §§ 2651–2653, forms the basis of the IHS, VA and DoD claims. Forming the basis of the HCFA claim is the Medicare Secondary Payer Act ("MSP"), 42 U.S.C. § 1395y. These statutes give the United States the right to enforce its subrogation claims either through direct action against the responsible third party or by joining an "action or proceeding" commenced by the federal beneficiary against the third party. 42 U.S.C. § 2651(b) (To enforce its right of recovery the United States may "(1) intervene or join in any *action or proceeding* brought by the injured or diseased person . . . against the third person who is liable . . . .; or (2) . . . institute and prosecute legal proceedings against the third person who is liable [on its own] . . . .") (emphasis added); 42 U.S.C. § 1395y(b)(2)(B)(ii) ("[T]o recover payment . . ., the United States may bring an action against any entity which is required or responsible . . . to make payment with respect to [the] item or service . . ., and may join or intervene in any *action* related to the events that gave rise to the need for the item or service.") (emphasis added). A settlement discussion, however, is not an action or proceeding. Nothing in either statute entitles the United States to barge its way into private settlement negotiations. Of course, both the MSP and the FMCRA put the plaintiffs and defendants on notice that, if they resolve their dispute through settlement without making appropriate arrangements to pay the United States for its subrogation claim, potential liability to the United States will continue post-settlement. But this potential for future liability is an entirely different matter from whether the United States can force its way into the negotiations. The fact is, it can do no such thing.

A second problem with the United States' theory stems from the fact that it does not possess claims against the Settlement Facility. The Plan channels all unsettled and unestimated Class 15 claims to the Litigation Facility. And once this channeling occurs, the Litigation Facility will assume complete liability for these claims. *Litigation Facility Agreement* § 2.03(a) ("The Litigation Facility hereby assumes and shall be directly and exclusively liable for any and all liabilities . . . arising in connection with, constituting or relating to . . . any Claim in Class[ ] . . . 15

713

... that was not Allowed or estimated for distribution on or before the Confirmation Date . . . .").

The United States' theory would improperly lead to the revival of claims against the Debtor that have already been disallowed. As noted, the United States filed four proofs of claim. By the United States' own admission, its original proofs of claims were insufficient. *See Transcript*, July 16, 1998 at 85. Both Proponents objected to the United States' claims. This began a long and complex discovery process that lasted approximately two and one-half years. And it merits noting that during this period, the Court urged the United States to supplement its proofs of claim on more than one occasion. *See, e.g., id.* at 84–86. The United States thus had ample opportunity to correct the omissions in its proofs of claims. When it failed to do so, the Proponents, on May 28, 1999, filed a motion for summary judgment seeking the disallowance of the Government's claims. The United States finally amended its proofs of claim in April, May and June of 1999. These amendments named 15,048 federal beneficiaries that, according to the United States, provide the basis for its claims against the Debtor. At the same time, the United States maintained its position that it also had claims against the Debtor for an unspecified number of federal beneficiaries that it had not yet identified.

■■■ The FMCRA and the MSP entitle the United States to recover, under certain circumstances, the costs of medical treatment that it provided to *an individual.* 42 U.S.C. § 2651(a) (Under the FMCRA, when the United States provides medical treatment to a federal beneficiary for injuries that arose under circumstances creating a tort liability upon a third party, it is entitled to recover from that third party the reasonable costs of the treatment.); 42 U.S.C. § 1395y(b)(2)(B)(ii) (The MSP similarly entitles the Government to recover, from the "required or responsible" entity, the costs of medical treatment that it pro-

vided to a federal beneficiary). At a minimum, then, the United States' proofs of claim must identify each of the individuals underlying its claim for damages. If the United States is unable to provide even this basic threshold information, it cannot possibly provide the additional information necessary to prove its claim, such as: the type of medical treatment provided, why the treatment was necessary, the costs of the treatment, etc.

■■■ It is black-letter law that a proof of claim that is properly executed and filed constitutes *prima facie* evidence of the claim's validity and amount. 11 U.S.C. 502(a); F.R.Bankr.P. 3001(f); *see also In re Durastone Co.,* 223 B.R. 396, 397 (Bankr.D.R.I.1998); *In re Premo,* 116 B.R. 515, 518 (Bankr.E.D.Mich.1990). As noted, and after years of inexcusable delay, the Government finally perfected its proofs of claim with respect to the 15,048 identified federal beneficiaries. But to the extent that the United States' proofs of claim failed to identify federal beneficiaries to whom it in fact provided treatment as a result of injuries allegedly caused by the Debtor, they were incomplete. As the Government's proofs of claim were not properly executed with respect to the unnamed beneficiaries, the Rule 3001(f) presumption of validity never arose. The United States had more than ample opportunity to correct this defect, but did not do so. Therefore, by order entered on October 27, 1999, this Court disallowed this portion of the Government's claims. *Order on Motion to Compel* at 2.

■■■ The United States also asserted that it has claims stemming from treatment that it might provide to eligible federal beneficiaries at some point post-confirmation. *See, e.g., Declaration of Lisa Vriezen U.S. Department of Health and Human Services, Health Care Financing Administration in Support of Proof of Claim* at 10 ("The [HCFA] claim includes payments already made, as well as payments for care to be provided in the fu-

ture."). The portion of the Government's claims based upon the furnishing of treatment post-confirmation are subject to disallowance under § 502(e). This section provides:

(e)(1) Notwithstanding subsections (a), (b), and (c) of this section and paragraph (2) of this subsection, *the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured, the claim of a creditor, to the extent that—*

(A) such creditor's claim against the estate is disallowed;

(B) *such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance* of such claim for reimbursement or contribution; or

(C) such entity asserts a right of subrogation to the rights of such creditor under section 509 of this title.

(2) A claim for reimbursement or contribution of such an entity that becomes fixed after the commencement of the case shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) of this section, the same as if such claim had become fixed before the date of the filing of the petition.

11 U.S.C. § 502(e) (emphasis added).

The MSP and the FMCRA entitle the United States to "recover payment" from the responsible third party for the costs of medical care that it provided to a federal beneficiary. 42 U.S.C. § 1395y(b)(2)(B)(ii); 42 U.S.C. § 2651. The Government does not dispute that its claims against the Debtor are for reimbursement. *Cf. United States Response to [Debtor's] First Set of Interrogatories ...,* Interrogatory # 6 ("In the event, and to the extent, that 11 U.S.C. § 509 requires HCFA to elect whether its federal statutory rights are in the nature of subrogation or reimbursement as those terms are used in the Bankruptcy Code, HCFA states that its claim is for reimbursement."); *see also*

*Webster's Ninth Collegiate Dictionary* 993 (1985) (defining reimbursement as the act of making restoration or payment); *see also U.S. Opposition to Proponents' Motion for Summary Judgment* at 51–58 ("*U.S. Opposition to Summary Judgment*") (apparently conceding that its claims are for reimbursement and arguing only that § 502(e) does not serve to disallow its claims because the United States is not co-liable with the Debtor and its claims are not contingent). Consequently, the applicability of § 502(e) to the United States' claims for medical care not yet provided depends upon whether the claims are contingent and whether the Government is "an entity that is liable with" the Debtor on the breast-implant claims that form the basis of its right of recovery.

The Court previously observed that cases and the relevant facts suggest that the Government is indeed co-liable with the Debtor. *See Report and Recommendation on United States' Motion to Withdraw Reference Pursuant to § 157(d).* The Government, however, is not prepared to concede the point. It expressly acknowledges that it is obligated to provide medical care to eligible breast-implant claimants. *U.S. Opposition to Summary Judgment* at 52; *see also United States' Reply in Support of Motion to Withdraw Reference* at 1 (stating that its "claims arise under federal statutes which *mandate* that [it] provide medical care and/or reimburse the cost of medical care incurred by eligible beneficiaries") (emphasis added). Yet, it argues that the federal Medicare programs which give rise to these obligations create a duty that is "different[ ] than the normal surety or guaranty relationship in that the United States does not share liability with the Debtor." *U.S. Opposition to Summary Judgment* at 53–54. And, according to the United States, these unusual obligations do not give rise to the "type of relationship contemplated by ... § 502(e)." *Id.* at 52. Citing *CCF, Inc. v. First Nat'l Bank & Trust Co. (In re Slamans),* 69 F.3d 468

(10th Cir.1995), the Government argues that if Creditor # 2's obligation to Creditor # 1 on a certain sum arises from a different ("independent") source of law than the Debtor's obligation on this same sum, Creditor # 2 is not "liable with the debtor" to Creditor # 1. The United States argues that, like the issuer of a letter of credit in *Slamans*, its obligation to provide medical care to a federal beneficiary is independent of any obligation that a third party, such as the Debtor, might have to that same federal beneficiary. *U.S. Opposition to Summary Judgment* at 54. And as was the case with the issuer of the letter of credit in *Slamans*, the Government argues that it should not be deemed to be "an entity that is liable with" the Debtor.

For two reasons, the Government's argument is unconvincing. *Slamans'* rationale that a creditor is not "liable with the debtor" on an obligation to another creditor if the obligations arise from "independent" sources proves too much. In *Slamans*, Sun Company (Creditor # 1) was owed a sum of money from the debtor. If it was unsuccessful in obtaining payment from the debtor, Sun Company had an absolute right to obtain payment on that same claim from First National (Creditor # 2), the issuer of the letter of credit. This meant that the debtor and First National were both liable for the same sum to Sun Company. Nonetheless, the court held that the debtor and First National were not co-liable on this amount. The linchpin of the court's reasoning was that First National had an independent obligation to honor the letter of credit. However, this fact seems to be entirely irrelevant. Every form of guarantee agreement creates an independent obligation on the part of the guarantor. Yet it also makes the guarantor co-liable with the primary obligor on the same underlying debt, even though these obligations arise from different contracts.

 More importantly though, *Slamans* is a Tenth Circuit decision and this Court is bound by the Sixth Circuit. And the Sixth Circuit has defined differently the phrase "an entity that is liable with the debtor." In the Sixth Circuit, co-liability exists when each party is obligated to pay the same person for the same benefits even if the obligations of each party arise from a different source. *In re White Motor Corp.*, 731 F.2d 372, 374 (6th Cir.1984); *see also In re Baldwin–United Corp.*, 55 B.R. 885, 890 (Bankr.S.D.Ohio 1985) ("The phrase 'an entity that is liable with the debtor' is broad enough to encompass any type of shared liability with the debtor, whatever its basis."); 4 *Collier on Bankruptcy* ¶ 502.06[2][b] (15th ed. rev.1999) ("Under section 502, codebtor status is broadly interpreted, and a claim for reimbursement has been held to presuppose a codebtor relationship.").

The Government acknowledges that, pursuant to a mandate in federal law, it is obligated to pay for or provide medical care to federal beneficiaries. As a result, it is *ipso facto* liable to these federal beneficiaries to pay for or provide such medical treatment. At the same time, if the Debtor is the party that caused the harm necessitating the medical treatment provided or paid for by the United States, it, too, is liable to the federal beneficiary for this same medical treatment. The Debtor and the Government are, therefore, both potentially liable to the federal beneficiaries for the same injuries. Hence, the Government is clearly "an entity that is liable with the [D]ebtor" with respect to the claims of breast-implant claimants.

 The claims of the United States that are based on medical treatment not yet provided are plainly contingent. A claim will generally be considered contingent if the debtor's obligation to pay depends upon the occurrence of an extrinsic event which may or may not occur at some point in the future and that was within the fair contemplation of the parties at the time of the incident giving rise to the claim. *See, e.g., In re Mazzeo*, 131 F.3d 295, 300 (2d Cir.1997) ("'Contingent' de-

notes a debt for which liability depends upon the occurrence of some future event or condition which may never be fulfilled.") (citations omitted); *Subway Equipment Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 220 (5th Cir.1993); *In re Fostvedt*, 823 F.2d 305, 306 (9th Cir.1987); *2 Collier on Bankruptcy* ¶ 303.03[2][a] (15th ed. rev.1999).[4]

The obligation of the Debtor to reimburse the United States for its costs for medical treatment of federal beneficiaries that it has not yet provided will depend upon the happening of an extrinsic event— the actual furnishing of such benefits. That the Government might, at some point, provide or pay for medical treatment is certainly within the fair contemplation of the parties. But there is no way of knowing whether the Government will

do so until it has actually happened. Therefore, the Government's claims for such treatment are contingent. Accordingly, these contingent claims must be, and on October 27, 1999, were disallowed pursuant to § 502(e)(1)(B).[5] *Order on Motion to Compel* at 2.

Now that there has been a final adjudication disallowing the portion of the United States' claims pertaining to the unnamed federal beneficiaries, those claims cannot magically revive and become non-disallowed when the Settlement Facility begins to pay allowed breast-implant claims. *See* 11 U.S.C. § 1141(d) (discharging the debtor, with certain exceptions not relevant to the Government's claims, from any debt that arose before the date of confirmation).[6]

4. At one point in this case, the Government argued that whether or not its claims are "contingent" must be decided under the MSP and the FMCRA. But this term is not found in either of these two statutes. Rather, "contingent" is found only in the Bankruptcy Code. As a result, whether a claim is or is not contingent for purposes of allowance in a bankruptcy case is purely a question of bankruptcy law.

5. The Court's order stated that it was disallowing all claims of the United States other than those arising from the benefits it provided to the 15,048 named beneficiaries. *Order on Motion to Compel* at 2. This opinion serves to supplement the reasoning provided from the bench for such disallowance. In addition, it is necessary to make one clarification with respect to this ruling. In the order, the Court stated that it was disallowing all of the Government's claims beyond the 15,049 beneficiaries identified. That number was taken from the *United States' Opposition to the Summary Judgment Motion* at 11–12. Therein, the Government mistakenly stated that it had identified 28 IHS beneficiaries. Review of the amended IHS proof of claim, however, shows that the Government actually identified 27 IHS beneficiaries. The true number of identified federal beneficiaries is 15,048.

6. The Government also complained of the effect that a so called "Cut-off Provision" would have on its claims against the Settlement Facility. This provision explains that "[c]ertain Claimants in Class[ ][15] have asserted rights ... to recover from the Settlement Facility if

the Settlement Facility pays Allowed Claims of Settling Personal Injury Claimants without notice to or an adjudication of competing rights of such Class [15] Claimants to such settlement amounts." *Plan* § 6.8. The Cut-off Provision then provides that "[the Debtor] will seek, as part of the Confirmation Order or pursuant to an adversary proceeding to be heard concurrently with confirmation, a determination that any such right to recover against the Settlement Facility shall be cut off by the payment of an Allowed Claim of a Settling Personal Injury Claimant ...." *Id.* If the Debtor is successful in this endeavor, "the sole remedy available to such Class [15] ... Claimant shall be to pursue a recovery directly from the Settling Personal Injury Claimant." *Id.* The Proponents have proposed to modify this provision to provide a second remedy to Class 15 claimants in the event that their rights to recover from the Settlement Facility are cut off. Besides being able to seek recovery from the settling breast implant claimant, the modification would enable Class 15 claimants to seek "injunctive or other equitable relief from the MDL 926 Court (to the extent such relief is available under applicable law) with respect to the Settlement Facility's payment of an Allowed Claim to any Settling Personal Injury Claimant whom the Class ... 15 Claimant timely identifies in connection with its filed proof of claim." *Post–Hearing Memorandum of Proponents* at 26.

The Government asserts that the Cut-off Provision "cannot be approved without an adversary proceeding and should not be ap-

The Government makes a feeble attempt to argue that certain of its MSP-based claims against the Debtor will arise only post-confirmation and, as such, are not subject to discharge. The MSP enables the United States to recover double damages from the responsible third party "if it does not make appropriate arrangements to provide for payment of the United States' claims." *U.S. Memorandum of Law* at 3 (citing to 42 U.S.C. § 1395y(b)(3)(A)). Relying on *In re Chateaugay Corp.*, 112 B.R. 513 (S.D.N.Y. 1990) and *In re Food City, Inc.*, 110 B.R. 808 (Bankr.W.D.Tex.1990), the Government maintains that its right to recover double damages would arise post-confirmation if the Reorganized Debtor pays primary claimants without arranging for the Government's share.

In *Chateaugay*, the United States sought declaratory judgment that certain claims arising against the debtor under the Comprehensive Environmental Response Compensation Liability Act ("CERCLA") were not discharged. A CERCLA claim, such as the one at issue in *Chateaugay*, can arise only upon the "release, or threatened release, of hazardous waste." *Chateaugay*, 112 B.R. at 521. If neither of these events occurs prepetition, a claim for compensation under CERCLA is not dischargeable in bankruptcy. *Id.* at 521. In *Food City*, the court observed that if the means for implementing a plan requires the proponent to violate a law post-confirmation, such violation will give rise to a liability of the reorganized debtor, not the estate. *Food City*, 110 B.R. at 813. The United States reasons that since its MSP claim for double damages can arise only

post-confirmation it should not be subject to discharge.

The Government's argument is not persuasive. All *Food City* said was that a plan cannot insulate a debtor from violations of law it commits after confirmation of the plan—not exactly a startling proposition. The question here is whether the Debtor would be violating federal law by exercising its right to a bankruptcy discharge as to the claims of the Government—those that are allowed and those that are disallowed. The *Chateaugay* case, in particular, belies the Government's position. That court stated that "[a] claim, even a contingent claim, arises under the Bankruptcy Code at the time when the acts giving rise to the alleged liability were performed." *Chateaugay* 112 B.R. at 520 (internal quotations omitted). And "[s]o long as there is a pre-petition triggering event, … the claim is dischargeable, regardless of when the claim for relief may be in all respects ripe for adjudication." *Id.* at 522.

The triggering events which give rise to the Government's claims against the Debtor arose prepetition. As a result, its claims must be resolved through the bankruptcy process. The MSP's double payment provision does not change this fact. The applicability of the double payment provision in this case is first dependent on the Debtor being found liable for a prepetition act—causing injury to a breast-implant claimant who received treatment from the United States. The Government must then show that the Debtor paid the claim of a federal beneficiary without making arrangements to resolve its competing

proved because it improperly denies creditors the right to participate in the plan of reorganization." *U.S. Memorandum of Law* at 9. The Court agrees that the relief contemplated in the Cut-off Provision can be obtained only through an adversary proceeding. *See* F.R.Bankr.P. 7001(9). As a result, the relief envisioned by the Cut-off Provision will not be accorded the Debtor pursuant to the confirmation order. Moreover, the Debtor has not instituted an adversary proceeding seeking

such relief. By the Plan's own language, the Cut-off Provision is not self-effectuating. The steps necessary to give it effect have not been taken. Thus, the Government's objection to this provision is moot. But this can be of little solace to the Government. Given our holding in this opinion, that the United States does not possess claims against the Settlement Facility, the relief sought in the Cut-off Provision is unnecessary as the Court cannot purport to cut off rights that do not exist.

claim. However, the Plan does make arrangements to resolve the United States' claims: They are channeled to the Litigation Facility and if the Government prevails at trial the claims will be paid in full.

To summarize the above discussion, the Government has filed proofs of claim against the Debtor seeking recovery for the costs of treatment provided to 15,048 named federal beneficiaries. Those claims, to the extent they are not resolved through the Proponents' pending summary judgment motion, will be channeled to the Litigation Facility for resolution. If such claims become allowed through trial or settlement, they will be paid in full with interest by the Settlement Facility. In addition, the United States does not possess claims against the Settlement Facility. Therefore, since all Class 15 claims will be paid in full, the Plan satisfies the requirements of § 1129(b)(2)(B)(i).

### III. Conclusion

The Plan does not unfairly discriminate against and is fair and equitable to Class 15. The requirements of cramdown are, therefore, satisfied with respect to this rejecting class.